# CHARLESTON.

DELAPLAIN *et al. v.* GRUBB *et al.*

(ENGLISH, JUDGE, *dissenting.*)

Submitted February 5, 1898—Decided April 6, 1898.

1. DEED—*Presumption of Law—Grantor's Competency.*

    The presumption of law is that the grantor in a deed was sane and competent to execute it at the time of its execution.    (p. 614).

2. DEED—*Old Age—Incapacity.*

    Old age is not of itself sufficient evidence of incapacity to make a deed.    (p. 614).

3. DEED—*Evidence—Grantor's Capacity.*

    The evidence of an officer taking the acknowledgment to a deed, or of a person present at its execution, is entitled to peculiar weight, in considering the grantor's capacity.    (p. 618).

4.   Deed—*Time of Execution—Grantor's Capacity.*

   The time of the execution of the deed is the material or critical point of time to be considered upon the inquiry as to the grantor's capacity.   (p. 614).

5.   Deed—*Grantor's Capacity—Old Age.*

   A grantor in a deed may be extremely old, his understanding, memory, and mind enfeebled and weakened by age, and his action occasionally strange and eccentric, and he may not be able to transact many affairs of life, yet, if age has not rendered him imbecile, so that he does not know the nature and effect of the deed, this does not invalidate the deed.   If he be capable at the time to know the nature, character, and effect of the particular act, that is sufficient to sustain it.   (p. 623).

6.   Deed—*Setting. Aside Deed—Undue Influence—Free Will—In Vinculis.*

   To set aside a deed for undue influence, it must be shown to the satisfaction of the court that the party had no free will, but stood *in vinculis.   Conley* v. *Nailor,* 118 U.S. 127.   (p. 623).

7.   Deed—*Setting Aside Deed—Undue Influence—Free Will.*

   To annul a deed for undue influence, it must appear that it was such as to destroy free agency, and substitute the will of another for that of the person nominally acting.   (p. 624).

8.   Deed—*Undue Influence—Suggestion and Advice—Gratitude.*

   Suggestion and advice, addressed to the judgment, are not undue influence.   Nor is a deed induced by an appeal on the score of gratitude, past kindness, or love or esteem the result of undue influence.   (p. 624).

9.   Deed—*Delivery of Deed—Intent of Parties.*

   Delivery of a deed depends on the intent of parties, and, though not in formal words, may be shown by circumstances.   If its parties meet to make it, and read, sign, and acknowledge it without reservation, this amounts to delivery.   (p. 624).

Appeal from Circuit Court, Ohio county.

Suit by Mary H. and Lewis S. Delaplain against Jacob W. Grubb and others to set aside certain conveyances. There was a decree for defendants, and plaintiffs appeal.

*Affirmed.*

Hubbard & Hubbard, for appellants.

Caldwell & Russell, for appellees.

Brannon, President:

By a deed of November 13, 1892, L. S. Delaplain convey-

ed to his wife a house and lot and furniture, valued at six-teen thousand dollars, in the city of Wheeling, and, by check, gave her six thousand dollars in bank. Delaplain died the 27th of November, 1893, leaving a daughter and children of a deceased son. He was worth some three hundred thousand dollars to three hundred and fifty thousand dollars, mostly personalty. Mrs. Delaplain later willed said real estate to her daughter Elizabeth Grubb. This was followed by a suit by the children of the deceased son to set aside the said deed, but the circuit court refused to do so and the plaintiffs appealed.

Delaplain was seventy-eight years of age at his death. He had for many years been the chief member of a large wholesale dry-goods firm in Wheeling, and by his fine sense, industry, and frugality amassed a fortune. Senile dementia is the ground on which we are asked to nullify the said transfers. Until a few weeks before his death this man was strong and vigorous, physically and mentally. At the outset, I state that old age will not, alone, affect his act, and that the presumption of law is that he was sane, and competent to make such transfers. *Buckey* v. *Buckey*, 38 W. Va. 168, (18 S. E. 476). We must find something else than old age, to cancel this deed. What is the basis on which that relief is asked? On several occasions he shed tears, saying that the little children would be left in poverty; supposedly referring to the children of Mrs. Grubb. He told his wife that the sheriff would come in, and sell them out of house and home. He expressed great apprehension of losing all his property, and at one time said that he had lost it all. He supposed everything was gone, and often talked about the little children being left in poverty. At the same time he was of large estate, and individually out of debt. This is regarded, I may say, as the chief weapon with which to overthrow the deed.

This peculiarity is capable of explanation short of his incompetency. On the 6th of August, 1893, the disastrous business panic which appalled the hearts of the stoutest business men was at its climax. Like a clap of thunder from a clear sky on that day came the failure of the Exchange Bank of Wheeling, producing wide business consternation there. Mr. Delaplain was its president.

He deeply felt the sting of this failure, and was very greatly depressed by it. He expressed great sympathy for the poor depositors, saying that he did not care for his own losses so much as for theirs. The effect of this bank trouble was that of deep depression upon him. He drank heavily from that up until three or four weeks of his death. His apprehension of financial ruin is a thing that might infest the mind of many persons,—especially aged persons. There was his large investment in a wholesale business house, and the panic paralyzed business. This house owed thirty thousand dollars. A young member of the firm went to New York to procure money, but reported that he could get none for any security. He expected to lose from the bank's failure. He had large investments in banks, manufacturing stocks, and in a ranch in Texas. Property in stocks, especially, was withering under the force of the depression of panic, and no man could well say what would be the ultimate outcome. The stoutest, strongest men quaked and trembled in that disastrous crisis. Why should not this old man fear the wolf at the door? It is very common, we know, from human nature, for men in age, who have been the stay and support of a family, to have excessive fear about those near and dear to them, after they shall have passed away. So that I do not see a controlling force in the circumstance which is spoken of. On one occasion Mr. Delaplain got out of his bay window, three and one-half feet from the ground, into the adjoining lot of the Presbyterian Church, with only his underwear on; but he seemingly recalled himself, and returned to his house. He was likely then thirsting for drink. The front door was kept locked so that he could not go out into the city to get drink, and likely this incident happened from that cause. On another occasion he came down into the hall, wearing only his underclothes, while the Reverend Dr. Swope was sitting there; but, seeing him, Mr. Delaplain was embarrassed, and returned upstairs. This is unimportant. On the day before his death he walked into Mrs. Delaplain's room, where a lady was present, without his outerclothing on, and asked if that was Chapline street. On one occasion he talked to Dr. Wilson, his attending physician, several minutes, and then seemed to

lose sight of who the doctor was, and said, "Why, that is you, Dr. Wilson, isn't it?" On another occasion his daughter-in-law sat down beside him in a car for some time without his recognizing her, but she did not at first recognize him, though much younger; and, when she said that she recently had a letter from her son, he asked her if it was not very hot where he was,—he being absent as a consul at Demarara. A very natural question. He recalled his grandson's whereabouts. This substantially covers the strange and eccentric conduct of Delaplain, given to support the bill. Strange conduct, to a certain extent, it was; but many cases show, as stated in *Buckey* v. *Buckey, supra,* that it will not invalidate a deed or will.

Old men, especially when troubled, are very forgetful, very absent-minded; but that does not show that when they come down to the actual act of making a transfer, and have that subject specially and definitely upon the mind, they are incapable of that act. Judge Carr said in *Burton* v. *Scott,* 3 Rand. (Va.) 406: "Many witnesses relate trifling and wild conversations held by the testator, and sometimes actions and conduct which certainly showed a want of sanity for the time being, such as running away and staying out all night, chasing his servants and throwing his cane at them, shutting himself up in his room for fear his family would kill him, etc. But these, when contrasted with the others, may, I think, be fairly accounted for on the score of intoxication." That eccentric action was stronger than any eccentricity of Delaplain in this case, and yet it was held not to affect a will, when it was correlated to the evidence of sanity. So I say in this case that those incidents can by no means offset the strong evidence of capacity of Delaplain, and the presumption of law that he was sane. Now let us turn to the opinion evidence. Dr. Wilson, the attending physician, expressed the opinion that Mr. Delaplain was incompetent to transact business, and his evidence is certainly not without weight, from his professional relations with Mr. Delaplain, and his capacity to judge of his sanity; but we must not let that evidence countervail the strong volume to the contrary. We must be very cautious how we overthrow the solemn deed of this man,

who during a long life had evinced so much intelligence
and force of character as a leading, successful business
man. The Reverend Dr. Swope, a witness for the plaintiff,
while relating the incidents above spoken of, sustains the
competency of Delaplain, from the fact that, when asked
for his judgment as to Delaplain's ability to attend to im-
portant matters of business, he responded that he could
not say. When asked whether, in his judgment, he was of
sound mind, or not, he responded that, in the conversations
he had had with Delaplain, the latter always talked intelli-
gently enough. While speaking of a change in Delaplain
after the bank failure, he said that Delaplain evinced more
dullness than before. When asked whether he ever found
Delaplain unable to apprehend what he said to him, he
answered, "No," and said that he never answered him in
any other way than in an intelligent way, and that his re-
marks were always pertinent to the subject under dis-
cussion, and that he displayed no lack of intelligence.
There is some other opinion evidence to the effect that
Delaplain was incompetent to transact serious business,
but it is not of forceful and decisive character, and it comes
from only two or three persons. What is greatly relied
upon is the fact that Mrs. Delaplain herself declared on
several occasions that her husband had been unsettled in
mind ever since the bank failure, and that Dr. Wilson de-
clared that he was unable to transact business. At first
view, these declarations of Mrs. Delaplain might be taken
to be strong, but that is simply because she is the grantee
in the deed. I doubt whether they are admissible, being
merely unsworn statements of hers. But grant their ad-
missibility; what do they show? Shall they be treated as
admissions? They cannot be, because one cannot lose title
to land by mere admissions. *Suttle* v. *Railroad Co* 76., Va.
284; *Jackson* v. *Davis*, 15 Am. Dec. 451, 455; *High* v.
*Pancake*, 42 W. Va. 607, (26 S. E. 536). But then it is mere
opinion. These declarations only enter into the case as
items of evidence,—as opinions of Mrs. Delaplain as to the
mere condition of her husband; and they amount to noth-
ing more, coming from her, than if coming from another
person. They are simply her opinions, to be taken for
what they are worth  Now take up the opinions on the

other side. We have the opinions of three utterly disinterested persons present at the time when the deed was made. They declared in unmistakable terms that at that time Delaplain was as intelligent as ever; knew the character of the act he was doing; did it deliberately, and was entirely competent to do it. This evidence of parties present at that time has more force than mere opinion of parties as to his sanity at other times, or, indeed, of his conduct and action at other times, because the time of the execution of the deed is the material or critical point of time to be considered upon the inquiry as to the grantor's capacity. *Buckey* v. *Buckey, supra.* One of the three persons present was the lawyer who drew the deed, and took Mr. Delaplain's acknowledgment. There is the evidence of the two co-partners in the mercantile business, thrown into daily contact with him for years, who have sustained his competency. There are the depositions of three apparently intelligent people, who were servants in the house, and observed his daily conduct down to his death, attesting his capacity. Other witnesses give their opinions to the same effect; so that, as to opinion evidence, that going to sustain his sanity is vastly preponderating. I cannot detail it here, but it comes from those who had the best opportunity of judging of Delaplain's capacity. The evidence of a joint owner with him of a ranch in Texas shows that he talked intelligently to him, after he returned from Texas, about the farm; remembering and talking of persons with whom he became acquainted on a visit which he had made ten years before. He talked with him, before his visit to Texas and after, about their business interests, in an intelligent and business-like manner. Capt. William List, who had known him so long, and talked with him almost every day,—their places of business adjoining,— attested his competency in strong terms.

Now let us leave the domain of mere opinion of witnesses as to Delaplain's capacity, and go to facts that speak for themselves. Here I will say that said transfers are attacked, not only because of the mental incapacity of Delaplain, but also because of undue influence exerted upon him by Henry K. List; and the facts I shall refer to —at least, some of them—answer both the allegation of

incapacity and undue influence. Delaplain thought of making a will. Let us say that List advised him so to do, and mentioned as a reason that he ought thus to protect his wife. Delaplain reflected upon it some days, and refused to do so. This tends strongly to negative incapacity and successful undue influence. Deliberation—unaided deliberation, his own deliberation against List's suggestion or advice—brought Delaplain's mind to this refusal. He told James P. Rogers, who acted as his lawyer, that he had thought of making a will, to keep his property from going to certain persons, but would not complete it then, but would think further about it. A few days later, Rogers received word, through List that Delaplain wanted him to draw two deeds for him. Rogers went alone to Delaplain's store, when Delaplain told him he had thought of making a will, but would rather make deeds, and told him he wanted to deed the homestead to his wife, and the store property to Mrs. Grubb. Rogers told him he could not make a deed directly to his wife, but must have an intermediary, when several persons were mentioned by Delaplain, but objections arose in his mind as to them, and Rogers suggested Ambrose S. List, a son of Henry K. List, and he was agreed upon. Then Rogers asked Delaplain whence his title came, and Delaplain told him, and he obtained descriptions of the property from what he told him. Delaplain spoke particularly of an agreement with one Hullihen's heirs years before, in connection with the home property, which he wanted him specially to hunt up, as it somehow concerned an easement of the home property, and he felt that there might be trouble about it. Rogers found the agreement on record, as Delaplain had said. After this deliberative conversation it was agreed that Rogers should come next day, at 10 o'clock, with the deeds; and at that hour Rogers found Delaplain on the sidewalk, at his store, as agreed. When Delaplain asked him if he had those papers, and was told that he had, he said, "Let us go up, then, to the City Bank," and they went. At the bank, Delaplain drew up to a window, and read the two deeds. He asked Rogers if he had examined the records as to the transfer of the property to him,—particularly the agreement as to the alley in the rear of

the homestead. Delaplain said he was ready to execute one of the deeds. Then Henry K. List came in, and Delaplain showed him the deeds, and they talked about them; and Delaplain told List that he had made up his mind not to sign the deed to Mrs. Grubb, but preferred the other, to be closed at once; and he signed it, and put the Grubb deed in his pocket, and sent Rogers to have Mrs. Delaplain execute the deed to A. S. List, the intermediary. When Rogers returned, A. S. List was there, and it took some explanation to get him to sign the deed to Mrs. Delaplain, Delaplain and Rogers explaining it. Delaplain told him that he had chosen him, as he was out of debt, and a single man, and that there would be no liability on him from signing it. We see he did not want to convey to a man under liens, or even debts, or who had a wife that would fasten a dower right on the property. This shows great caution. Rogers left, leaving Delaplain and Henry K. List talking about their iron stocks. Then, too, Delaplain made a check to his wife for six thousand dollars, List drawing it; and it was placed to her credit in that bank, of which List was president. Several times before these transfers, Delaplain talked to List on the subject of taking some steps for the benefit of his wife, and the transfer was but the execution of what he had been cogitating in his mind for some time. Such are the circumstances that constitute the *res gestæ* of these transfers, and I need only say that they alone tell of the careful thought, deliberation, and competency of Delaplain. If under List's undue influence, why did he not execute a will as List suggested? He rejected that suggestion. Why did he not execute the Grubb deed? List admits that he did want to get Delaplain to make a will to protect Mrs. Delaplain, but when Delaplain refused, List dropped the matter. List declares that he did nothing, by suggestion or otherwise, to dictate the deeds; that Delaplain did not even ask him whether he ought to make them, nor did he say to Delaplain that he ought. List swears the action was Delaplain's deliberate, free action. So does Rogers. So does A. S. List. List seemed to be acting for Mrs. Delaplain's interests,—the only motive, he says, that he had. She had probably requested him to do so. What of this? Mrs. Delaplain did nothing wrong, in soliciting her

husband to make provision for her in his failing health. Who had higher claims on him? List had known Delaplain many years,—both prominent, successful business men of Wheeling; and after the closing of the Exchange Bank, Delaplain made deposits in the bank of which List was president, and they became more intimate than before. What if List did, in the interest of Mrs. Delaplain, advise Delaplain to make provision by will? He dropped the subject, however, when Delaplain refused. Look at the act of transfer itself. It speaks good sense, as well as love and justice to his aged wife. If he died, she would likely not get the homestead as dower; but this deed avoided this danger, and gave her the home in which she had so long resided. Without the check, she would have no ready money, but would have to await the action of an administrator, and the settlement of the estate, perhaps. If he made a will, she could not demand a legacy for a year. Why should he not, to meet instant wants, give her the home furniture, and some ready money,—in all about twenty-two thousand dollars, out of from three hundred and twenty-five thousand dollars to three hundred and fifty thousand dollars. He knew these things would be a certainty, whereas his goods and bank and other stocks might, in the terrible panic, be lost or unavailable. See how he pondered over whether to make a will or not. He thought of doing so to restrain his property from going to certain persons, but finally concluded, after providing for the immediate needs of his wife, to let the law distribute it. He thought of giving Mrs. Grubb the valuable store building, but finally concluded to let it go into distribution between her and his grand-children. To me, all these things bespeak judgment, caution, and competency. Another circumstance tells of his competency. His young co-partners wanted an arrangement by which the mercantile business could be continued, and wanted him to put a certain sum in; and he said to one of them: "No, Hull; you and Gibbs are young men, and if I place anything in there, and you would fail I would lose everything. If you haven't anything you ought to have." He talked with so much sense, though unwell, that one servant in the next room remarked to another that it would be hard to fool Mr.

Delaplain. This was two weeks before his death. He had signed a paper relating to the continuance of the business, by which he was to put in the business seventy-five thousand dollars, reflected over it, became dissatisfied, and requested its cancellation, said it ought to be cancelled. One of the partners consented to its cancellation, and Delaplain was so thoughtful as to suggest that the other partner ought to be present.

In argument, the fact that the deeds were taken to List's bank before signing was urged as tending to show that Delaplain was under the bidding of List. We have seen how the evidence negatives this charge of undue influence; but this very circumstance furnishes additional evidence. A. S. List, the intermediary, was a clerk at that bank. They had to go there to see him. Delaplain did not intend to execute a deed to him, and then let the deed from A. S. List to Mrs. Delaplain be neglected, but went and saw A. S. List, and was particular to see the deed from List to his wife actually executed. This was prudence,—business done in a business-like way. I will add that by numerous witnesses it is proven that, when talking of business, the long-time arena of this old man, he talked—as he always had—with judgment and intelligence. Never once do we hear of his saying anything but what was intelligent as usual when talking of business. This is well attested. The evidence does show that after the bank failure he declined,—clearly shows this; but the bulk of the evidence shows that this decline and weakness were physical, not mental. All these indicia point to one thing, unmistakably,—the competency of Delaplain to do these acts. They point there so strongly that I am led to say that it would be a travesty upon justice for this Court to defeat a deed deliberately made by this strong-minded old business man, giving to the aged partner of his bos o m, when he knew sh would outlast him, a small portion of his estate, their old home, as a shelter over her head. Courts overgo their proper mark when they thus deprive a man of his right to do what he lists with his hard-earned property. If his wife disposed of this property with unfairness and partiality, we cannot help it. It is only with Mr. Delaplain's act that we have to deal. If human testimony is to be

credited, the three witnesses of the crucial moment prove Delaplain's full competency—a competency as strong as ever—to make the deed. But such strong competency is not required. Even if his mind were weak and debilitated, compared with what it had been, his demeanor on occasions eccentric, and even if he had not capacity to transact general business, yet if he understood, as he clearly did, the nature of that particular act,—recollected the property he was disposing of, and the person to whom he was giving it, and how he desired to dispose of it,—that is enough to make his act valid, as we held in *Buckey* v. *Buckey*, 38 W. Va. 168, (18 S. E. 476). Under this criterion,—under any criterion which the books give us,—this deed and check are valid.

I have above incidentally adverted to the charge of undue influence. There is no suggestion of undue influence emanating from any one but Henry K. List. That is wholly unsustained. There is no basis on which to assert it, but List's suggestion, in the interest of Mrs. Delaplain, to make a will, and to his presence when the deed and check were made, and to his telling Rogers that Delaplain wanted him to draw the deeds. These circumstances will not sustain this grave charge. Delaplain ignored this so-called undue influence, in refusing to make a will; and he himself originated, as his own preference, the act of doing what he wished by the deeds. List did not suggest this. How is it strange that Delaplain should talk to his old acquaintance about such things? Many do so. Undue influence to do what? Undue influence to make a transfer to List or his kindred? No; neither he nor any of his kindred got a dime. Undue influence to do what? To make a deed to give the home, and some ready money for maintaining it, to Delaplain's aged wife, in case of his death, in times of panic and financial distress, out of a large property. The very reasonableness and justice of the act dissipate the thin shadow of undue influence. A disposition of property, induced by gratitude for kindness, affection and esteem, is not the result of undue influence. 27 Am. & Eng. Enc. Law, 497. If all that is suggested against List's acts were fully true, it would not amount to "undue influence," in the eye of the law; for it must be of such a

nature as to overcome the free agency. *Forney* v. *Ferrell*, 4 W. Va. 729. Both as to deeds and wills, "the underlying idea is that the infleace must be such as to destroy free agency, and substitute the will of another for that of the person nominally acting." 27 Am. & Eng. Enc. Law, 453. The highest court in the land has put the principle so strongly as to say that, to set aside a deed or will for undue influence, it must be shown "that the party had no free will, but stood *in vinculis.*" "It must amount to force or coercion destroying free agency." *Conley* v. *Nailor*, 118 U. S. 127, 135, (6 Sup. Ct. 1001). It is idle to say that this case remotely approximates this standard. "Suggestion and advice, addressed to the understanding and judgment, never constitute undue influence; neither does solicitation, unless the testator be worn out with the importunities, so that his will gives way. Even earnest entreaty, importunity, and persuasion may be employed, as well as appeals to remember past kindness or to relieve distress. The criterion in every case is, is the influence irresistible? If it is, the will is not the instrument of the testator, and cannotstand. If it is not, the influence is not undue and its existence is immaterial, even though the testator did in fact yield to it." 27 Am. & Eng. Enc. Law 498: Redf. Wills, 522, 524, 533. *Greer* v. *Greer*, 9 Grat. 330, will strongly support me, both as to competency to do the act, and undue influence. Evidence was given that the widow of Delaplain's deceased son showed List a letter from her husband to his father, when List said that if he had known that sooner, things might have been different. List did not remember what was in the letter or how to explain what he meant. How are we to know, or to allow the circumstance weight? The letter or its contents are not in the record. Shall we grope in the dark to guess its contents and the meaning of List?

The deed is claimed to be no deed, for want of delivery. It is beyond question that the parties to this deed met for the purpose of completing it. The grantor signed it and acknowledged it, without a hint that it was to be withheld for any purpose; and this alone made it a deed, without formal words of delivery, as delivery depends on intent of parties, and, though not formal, may be shown by circum-

stances. Acknowledgment alone is strong to show dilivery. *Furguson* v. *Bond*, 39 W. Va. 561, 566, (20 S. E. 591). But there is further evidence than signing and acknowledgment. List says that Delaplain directed Rogers to take the deed to the clerk's office, and have it recorded. Rogers says in one examination, that Delaplain so directed him, and that he put it on record. Of course, if Delaplain so directed, that was delivery. Rogers, in another examination, says that Delaplain told him to take the deed to Mrs. Delaplain, and he did so, and she directed him to record. This was clear delivery. Rogers, from some cause,—likely, neglect,—did not record it until after Delaplain's death. But Delaplain, it is certain, parted with possession and dominion over the deed, and reserved no control over it; and it was, in Rogers' hands, as the custodian for the benefit of List, the intermediary grantee, a perfect deed. Delaplain reserved no right to recall it. This is quite different from the case where the grantor yet retains possession of a deed until his death as in *Lang* v. *Smith*, 37 W. Va. 725, (17 S. E. 213). The very fact that the deed was not retained by Delaplain raises the presumption of delivery. The evidence of List and Rogers in any view, proves actual delivery. Decree affirmed.

*Affirmed.*