William L. HENDRICKS, Blanche Hendricks Todd, Kenneth M. Hendricks and Ralph Hendricks, Plaintiffs and Respondents,

v.

H. A. PORTER, Defendant and Appellant.

No. 7885.

Supreme Court of North Dakota.

Aug. 24, 1961.

A. J. Pederson, Kenmare, and McGee & Van Sickle, Minot, for plaintiffs and respondents.

Murray & Rosenberg, Bismarck, for defendant and appellant.

TEIGEN, Judge.

This is an action to quiet title to a quarter section of land located in Ward County, North Dakota.

The real purpose of the action is to cancel and set aside a quitclaim deed executed by H. W. Hendricks dated January 4, 1959, which purports to convey the property to the defendant Hal A. Porter, known in this action as H. A. Porter. The plaintiffs are the children and heirs at law of H. W. Hendricks. H. W. Hendricks died January 10, 1959, six days after the execution of the deed. The plaintiffs attack the deed on two grounds—(1) That the said H. W. Hendricks did not have sufficient mental capacity to know and understand the business which he was transacting at the time the deed was executed; and (2) Undue influence.

The action was tried to the court without a jury.

The grantor, H. W. Hendricks, upon his death also left a last will and testament, which was contested by these same plaintiffs. The proponent of the contested will was the defendant in this action. That case was tried in the district court before the same district judge but with a jury. It was stipulated and agreed by and between the parties to this action that a transcript of the evidence adduced at the will contest and the exhibits received in that case constitute the evidence in this action and, in addition thereto, the questioned quitclaim deed was stipulated to be received in evidence as an exhibit. No additional evidence was adduced and both parties rested.

The trial court prepared no memorandum decision. It found in favor of the plaintiffs and in its findings of fact, conclusions of law and order for judgment found that the quitclaim deed described above was null and void because H. W. Hendricks, at the time of the execution thereof, "was not in a situation to transact that particular business rationally and the mind and memory of the grantor were in such a situation at the time of executing the deed as to render him wholly incompetent to judge of his rights and interests in relation to the deed transaction." The trial court further stated that Hendricks was a person who was subject to being influenced and "that the defendant, H. A. Porter, exerted improper influence and had done so by a policy of currying favor and making affirmative suggestions and procuring and seeing to the execution of and retaining possession of instruments of conveyance at a time when said H. A. Porter was in a confidential relationship with Hiram Wesley Hendricks; that Hiram Wesley Hendricks submitted to the overmastering effect of the unlawful conduct of H. A. Porter and did execute such conveyance or deed or instrument as was presented to him without exercising his independent judgment and that as a result thereof, said purported conveyance was executed."

The defendant has appealed from the judgment and demands trial de novo in this court.

The quitclaim deed was duly acknowledged and recorded. Its form is not questioned.

Considerable testimony was taken, much of it reviewing the history of the deceased grantor, H. W. Hendricks. Its purpose was an effort to prove the grantor incompetent and to prove to the satisfaction of the jury that at the time of the execution of the will under contest, which was executed June 18, 1958, the grantor-testator lacked testamentary capacity. On this issue the jury returned a special verdict that the said deceased, H. W. Hendricks, did have testamentary capacity at the time of the execution of the will. Evidence also was adduced in support of the contention that the will was procured by undue influence on the part of Porter upon the testator, H. W. Hendricks, and on this issue the jury found in the affirmative and thus returned a general verdict that the will was not the will of the deceased. Thus the will was set aside as void. This will provided that all of the property of the testator was willed to the defendant in this action, H. A. Porter, except for the sum of $53 which was willed to the testator's four children. The

will contest case was also appealed and is before us for decision in another case.

The will in question was executed on June 18, 1958, and the quitclaim deed in question was executed on January 4, 1959. The trial court in the deed case found that the deceased was mentally incompetent to consummate the transaction, as well as having been unduly influenced by the named grantee, H. A. Porter, the defendant in this proceeding.

H. W. Hendricks was 83 years of age at the time of his death on January 10, 1959. In 1921 the deceased, H. W. Hendricks, and his wife were living in a rooming house at Davenport, Iowa. They had three children and his wife was pregnant. According to the testimony of the oldest son when he was asked to tell how the separation was accomplished, he stated, "my mother just picked up and left and we moved to Danville, Illinois." He also testified that she took the children with her and the fourth child was born after the separation. Some time later his wife obtained a divorce. The children remained in the custody of the mother. About four years after the separation, the mother and the children moved to Colorado Springs, Colorado, where they remained for several years. At the time of the trial the mother was residing at Azusa, California, where she is employed in a hospital as a dietician. She has lived there since about the year 1943. The oldest son, William, resides at San Diego, California. Two of the children reside at Phoenix, Arizona, and one child resides at Danville, Illinois. All of the children at the time of Mr. Hendricks' death were adults. The deceased never remarried. It appears the deceased, Hendricks, had very little contact with his children after the separation in 1921.

The oldest son, William, testified he came to visit his father where he lived on his farm near Kenmare in 1931. He was then about 20 years of age. He remained with him for several months, secured a job on a farm near Devils Lake where he worked for about six months, and then left the State of North Dakota. He then went to California where he maintains his residence. He also testified that he started corresponding with his father in about 1948, which correspondence continued until he died in 1958. He testified that his father asked him to come and visit but that he did not do so because of a shortage of funds. He testified that he was a single man employed in landscaping and gardening.

Another son, Kenneth Hendricks, testified. He did not recall the separation of his parents. He was reared by his mother and states that the first recollection he has of seeing his father was in February 1948 when the father called at his home in Phoenix, Arizona, and remained for approximately three weeks. He then went to his daughter's home, which is also in Phoenix, Arizona, where he remained for sometime. They each treated him as a member of the family while in their respective homes. He testified that his father visited him a second time in November 1950. He again stayed at his home for a time and then went to the daughter's home and lived there for a while. After this the father moved into a little place which he rented for himself. This also occurred after the 1948 visit when the father rented a trailer into which he moved.

The son Kenneth testified that he did have correspondence with his father regularly after these visits and that they never had any quarrels; however, the correspondence dropped off in about 1956 or 1957. He states that he stopped for no particular reason; that he was not much of a letter writer. Kenneth is the manager of a wholesale produce company where he has been employed for the past 21 years. He is married and has children. He never visited his father at Kenmare.

On the basis of the record before us, the foregoing appears to be the only contacts the deceased had with members of his

family after the separation in 1921, a period of 37 years.

It is not clear from the record when the deceased, H. W. Hendricks acquired the quarter section of land in question in this action. However, it does appear he had owned it for a good many years and perhaps acquired it at about the turn of the century. One witness testified that he was 60 years of age, was born and lived near the land in question and had known Mr. Hendricks all of his life. Whether the family ever lived on this land or not is not disclosed. It does, however, appear that the defendant lived on this land and farmed it. In addition thereto, for 25 or 30 years, H. W. Hendricks was engaged as a Rawleigh salesman traveling about the countryside selling Rawleigh products.

At some time after 1931, when the deceased's son, William, visited him, and before 1937 or 1938 when a highway patrolman had called at the deceased's home in Kenmare, the deceased moved from the farm and into a house near the outskirts of Kenmare, North Dakota. He later moved from this house into another small house also located at the outskirts of Kenmare, where he was still residing when he died in the Kenmare Hospital on January 10, 1959. The dates or reasons for these moves are not in the record.

It appears the deceased lived alone after his separation in 1921, except for some of his winter trips, of which he took several. On two of these trips he lived for a short period of time with his son and his daughter in Phoenix, Arizona. On these occasions, it appears from the testimony of his son that after a few weeks the deceased moved out of the respective homes and into a trailer, and on another occasion into a small place which he rented. The deceased took several winter trips, some to Florida, some to Arizona, some to Texas and on one occasion to Hawaii. He rented his farm in 1944 to a neighbor who was still farming the land at the time of the trial. It also appears the deceased spent a few years in Canada some time after the separation in 1921.

The deceased was a lonesome old man. He had been separated from his family for almost 40 years during which time he lived a bachelor's life alone and unwanted. The only close acquaintances seem to be those with whom he did business—his renter on the farm, his tenant of the house which he owned in Kenmare and finally the last short period of his life, approximately 23 months, the grantee on the deed, the defendant in this action, H. A. Porter. The people with whom he associated the most appear to be these people. All of them testified the deceased often spoke of his children and although the son Kenneth testified that his .father had not supported them since the separation in 1921, it appears that nevertheless the deceased felt his children should have given him more attention and he was desirous that they would look after him in his old age. He spoke of it so often that it became monotonous, so testified a tenant of his house of 7 years.

While the deceased was in Canada, he executed a last will and testament bequeathing and devising all of his property for the benefit of children and youth generally. In January or February of 1952, he executed a new will bequeathing and devising all of his property to the School for Crippled Children at Jamestown. In September of 1952, he instructed an attorney at Minot, North Dakota, to draw a joint tenancy deed of his North Dakota property, consisting of the quarter section of land in question in this lawsuit, together with two separate pieces of property at Kenmare, to his four children, and a similar deed of certain real property owned by the deceased in the State of Texas. These deeds, however, were never executed.

On September 22, 1955, the deceased executed another will bequeathing and devising substantially all of his property to Dakota Boys Ranch located near Tolley,

North Dakota, with some small bequests to his children. On July 23, 1956, he executed a new will bequeathing and devising all of his property to his children, share and share alike. On June 18, 1958, he executed his last will and testament bequeathing and devising substantially all of his property to H. A. Porter with small bequests to his children—$50 to his oldest son William and one dollar each to the remaining three children. On January 4, 1958, he executed and delivered the deed in question covering the quarter section of land in North Dakota to the defendant, H. A. Porter.

As a result of his visits to Phoenix, Arizona, he became quite attached to his granddaughter, the child of his daughter with whom he had visited for a few weeks in 1948 and again in 1950. For a time after these visits they carried on correspondence; however, the deceased was hurt when the granddaughter ceased writing to him. It appears he had the most confidence that his eldest son William was the more likely one to help him. He was the son that had visited with him in 1931 and it was he who kept up correspondence the longest. It appears the deceased held out hopes that he would come again and care for him in his old age. According to the testimony of the defendant, H. A. Porter, the deceased became angry at William when on an occasion shortly before he executed the last will and testament, William wrote and stated he would come only if the deceased would send him $600.

Into the life of this lonely man came the defendant, H. A. Porter, on or about February 4, 1957. The defendant, a divorced man, set up practice as a chiropractor in Kenmare a short time before. The deceased came to him for treatments. The defendant befriended the deceased. He gave him many chiropractic treatments and what he terms "semi-chiropractic treatments."

The background of the defendant is well summed up in the brief of the respondent wherein it is stated—"Dr. H. A. Porter has had a good education and wide and varied occupational experiences. He is a graduate of the Palmer School of Chiropractic and he has taken post graduate work at Logan College of Chiropractic at St. Louis, Missouri. Prior to that he worked in several occupations and professions in about 14 states. His occupations include high school teaching, work in a bank, professional photography in the moving picture industry, photography for New York newspapers and many others." He was a man of many and wide experiences. He was about 62 years of age and at the time of the trial had been engaged as a chiropractor for about 20 years. In addition to giving the deceased professional treatments, the defendant did many other things to ingratiate himself in the mind of the deceased. He took the deceased home many times in his car. He wrote many letters for him. He went with the deceased on many occasions to boxcars along the railroad tracks where he assisted him in gathering spilled grain which the deceased took home to feed his chickens. He would go to the deceased's home whenever the deceased called him by telephone, even on cold winter nights. Except for three months in the winter of 1957–1958, which the deceased spent in Tampa, Florida, the defendant stated he was with him on an average of four to five days each week and often gave him "semi-treatments." The deceased seemed to appreciate these treatments and the services rendered him by the defendant. While the deceased was in Tampa, Florida, for three months in the winter of 1957–1958, the deceased wrote the defendant each week. The deceased often spoke to the defendant about his children and registered disappointment and anger when the oldest son failed to come as the deceased had requested and in December of 1957, from Tampa, Florida, wrote the defendant in part—"I have no intention of favoring the Dakota Boys Ranch. I am giving children each $50. I don't get a scratch from them one I may do different if he comes here."

Defendant admits the deceased told him that he might decide to give him his property if he continued treating him so well. Defendant also admits that he went out of his way to treat the deceased well. The will drawn in June of 1958 was drawn by the defendant in his office. The deed in question in this lawsuit, executed on January 4, 1959, was also drawn by the defendant. The defendant did much to ingratiate himself in the mind of the deceased.

The deceased had some idiosyncrasies and some peculiarities. Much evidence was introduced in an effort to substantiate the contention that the deceased was incompetent and unable to transact his business. It was shown that the deceased had a quick temper. He was a poor farmer. His quarter section of land while he farmed it was cut up into about 13 fields. He kept goats and when peddling Rawleigh products, he was sometimes seen with a goat riding beside him. He had no mercy for animals. He was seen hauling grain with a regular two horse wagon drawn by one horse. It was the only horse he had. On an occasion when a goat dropped into the well and the neighbors came to assist in removing it, it was testified that after a rope had been attached to the goat, the neighbors were about to pull the goat up and the deceased asked them to wait saying that maybe the goat had not finished drinking; that his house was dirty; that he kept chickens and goats in the house at times; that he went to the dump grounds located about three blocks distant from his home regularly and brought home many things like articles of furniture, particularly women's shoes that had been discarded. He threatened to shoot some children who had been molesting him. On an occasion he shot two crows sitting in the trees near his house. When he was arrested for the illegal discharge of a firearm within the city limits, he stated in explanation that he heard someone talking outside of his house; that he went out to examine and heard the voices coming from the trees. When he saw the crows he went and got his shotgun and shot them. It appears that the complaint was lodged by the owner of the crows. The crows were tame crows taught to talk.

On various occasions the authorities of the City of Kenmare found it necessary to send someone to the deceased's home to demand that he clean up his place. He was always talking about "money-making schemes." Some of them were such as raising oysters, raising snakes for a hobby, raising bees, etc. However, it also appears that the deceased always conducted his own business. These are not peculiarities that cast doubt upon the grantor's mental capacity to understand the meaning and effect of executing and delivering a deed. In the case of Nordby v. Sagen, 64 N.D. 376, 381, 252 N.W. 383, 385, this court said:

"It is true that the evidence indicates the decedent was peculiar in many ways, complaining of a soughing sound in his head, pains in his head, and stomach, and exhibited many peculiarities which would indicate eccentricities at least; but such things, or even 'impairment of faculties by disease or old age will not invalidate a deed, provided the grantor fully comprehended its meaning and effect, and was able to exercise his will in executing it.' Meyer v. Russell, 55 N.D. 546, 214 N.W. 857."

Upon his death the deceased was worth approximately $20,000; that regularly in the wintertime, after leasing his farm in 1944, he would make trips to the south where he found more favorable climate. His tenants had no hesitancy in dealing with him and his legal work was done by attorneys of his choice, except for the last will and testament and quitclaim deed in issue in these two lawsuits. He consulted with various attorneys in connection with his legal matters; he leased his land for oil purposes and in connection therewith held off for some time while he negotiated with several prospective lessees. We have searched the record with care and believe that the jury in the will contest case was

correct when it found in its special findings that the deceased did have testamentary capacity to make his will, and we believe he was competent to transact business a short time thereafter when on January 4, 1959, he executed and delivered the deed in question.

The deceased, Hendricks, had been in the hospital for a few days before he executed the deed in question and he died six days after its execution. There is no medical testimony or expert testimony as to either his physical or mental condition. The registered nurse employed at the hospital was a witness to the signing of the deed. She testified that before the signing, she asked for an explanation of the instrument and that the defendant, H. A. Porter, explained that it was not a will, it was a quitclaim deed. With this knowledge there is no indication from her testimony that she hesitated or that she was reluctant to sign as a witness on the belief that the deceased was mentally incompetent to transact business. Another person present at the time of signing was the notary public, who certified acknowledgment and proof of the execution of the deed. He was a businessman living in Kenmare, was acquainted with the deceased and testified that he had no reason at all from the actions of the deceased, or his observations of him, to think that he was not in his right mind. Other testimony indicates the defendant's mental condition remained about the same through all of these many years but that he did deteriorate some physically and mentally as he grew older. The deceased at the time of the execution of the deed was a patient in the hospital with what developed to be his last illness. There is no evidence indicating his physical condition on January 4, except that he was hospitalized. There is no evidence of the nature of the illness, no evidence of medications, no evidence of the degree of suffering, if any, and no evidence of the cause of death.

Capacity of a grantor to execute a deed is capacity at the time the deed is made. Johnson v. Johnson, N.D., 85 N.W. 2d 211; Lee v. Lee, 70 N.D. 79, 292 N.W. 124; Meyer v. Russell, 55 N.D. 546, 214 N.W. 857.

In the case of Lee v. Lee, supra, 70 N.D. at page 84, 292 N.W. at page 126, this court said:

"The test of capacity is laid down by this court several times. In Nelson v. Thompson, 16 N.D. 295, 301, 112 N.W. 1058, 1060, this early rule deduced from Jackson [ex dem. Cadwell] v. King, 4 Cow., N.Y., 207, 15 Am.Dec. 354, 355, was adopted: 'Upon the question of incapacity to render a deed invalid, the court must be satisfied that the grantor was not in a situation to transact that particular business rationally—not, on the one hand, that he should be capable of doing all kinds of business with judgment and discretion, nor, on the other hand that he should be wholly deprived of reason, so as to be incapable of doing the most familiar and trifling work. That, if the mind and memory were in such a situation at the time of executing the deed as to render him wholly incompetent to judge of his rights and interests in relation to that transaction, the deed would be void.'

"In Meyer v. Russell, 55 N.D. 546, 214 N.W. 857, we say: 'Impairment of faculties by disease or old age will not invalidate a deed, provided the grantor fully comprehended its meaning and effect, and was able to exercise his will in executing it.'

"Again: 'Before the court will set aside a conveyance on the ground of mental incompetency of the grantor it is necessary to show that the grantor, at the time of the execution of the instrument, was so weak mentally as not to be able to comprehend and understand the nature and effect of the transaction involved.' Nordby v. Sagen, 64 N.D. 376, 252 N.W. 383.

"Old age alone does not affect competence, even though the mind may be weak and impaired compared with what it has been, and even though the capacity to transact general business may be lacking. This is the rule set forth in 16 Am.Jur. 486, [Deeds, Sec. 85], and it is supported by the citation given therein—Delaplain v. Grubb, 44 W.Va. 612, 30 S.E. 201, 67 Am.St.Rep. 788. On this point see Doyle v. Doyle, 52 N.D. 380, 389, 202 N.W. 860, 863."

"Upon the question of incapacity to render a deed invalid, the court must be satisfied that the grantor was not in a situation to transact that particular business rationally." Johnson v. Johnson, supra; Lee v. Lee, supra.

■ Although the respondents do not argue the claim, implications may have been raised from the evidence that the deceased suffered from monomania or delusions. Such indications may have been advanced from some of the evidence attempting to establish the peculiarities of the deceased over a period of about 40 years and heretofore referred to in this opinion. However, we have viewed the evidence with that consideration in mind and do not feel it is sufficient to establish monomania or any specific delusions and, furthermore, if from the evidence in this case any were established, they could not possibly in themselves establish mental incompetency to execute this deed because the execution and delivery of the deed in question was certainly not induced nor affected thereby. 26 C.J.S. Deeds § 54, Subsec. c. p. 727.

The one remaining question for us to review is whether or not the questioned deed is void by reason of undue influence exerted upon the grantor by the defendant, H. A. Porter.

There is no direct evidence in the record to indicate H. A. Porter exerted undue influence on the deceased resulting in the execution of the deed. There are only circumstances in the evidence from which inferences might be drawn which would tend to show that perhaps H. W. Hendricks was under the influence of the defendant, H. A. Porter. There is nothing to indicate solicitation of a transfer on the part of the defendant, unless it should be inferred from acts of kindness and the defendant's admitted desire to be as helpful as he could to the deceased because the deceased had told him that if he continued to treat him well, the deceased would leave him his property.

The deceased, H. W. Hendricks, does not appear to have been susceptible to influence. It was his practice, however, to ask questions and it appears he had an inquisitive mind. It also appears he was rather firm minded, even to the point of stubbornness on some occasions.

■ Hendricks' ownership of the property in question was absolute. Our statutes provide that when a single person has an absolute dominion over it, he may use it or dispose of it according to his pleasure, subject only to general laws. Section 47–0202, NDRC 1943. Absolute ownership of property implies the right of arbitrary disposition of such property by a capable and uninfluenced person. Disposition of property by will or by deed often indicates a preference or disregard of persons or causes, but if a party owns the property absolutely and has mental capacity and is uninfluenced, the law does not concern itself with it for such reasons.

There was no attempt to secrete the deed. It was immediately forwarded to the office of the register of deeds for recording and was recorded before the grantor died.

■ The existence of undue influence is a question of fact. See 16 Am.Jur., Deeds, Sec. 449. Determination of undue influence which will void a deed depends upon circumstances of the particular case. Johnson v. Johnson, supra. Whatever form undue influence may take, three factors are

always involved: (1) A person who can be influenced; (2) The fact of improper influence exerted; and (3) Submission to the overmastering effect of such unlawful conduct. All three must be present. See *Johnson v. Johnson, supra.* We have carefully examined the evidence in this case and are unable to conclude therefrom that it may be reasonably said these elements were present.

The respondents argue that the deceased at the time of execution of the deed at the hospital stated: "I don't like this business." However, upon an examination of the testimony of the witness and in the further light of the testimony given by the notary public who was also present, it does not appear this statement was made pertaining to the deed. The witness testified as follows: "Well, as Dr. Porter was getting ready to get two pillows ready I remember he was standing up against the wall and Mr. Hendricks did say, 'I don't like this business.'" The notary public also was present and testified as follows:

"Q. And what did Mr. Hendricks say, if anything? A. He said, 'just a moment,' and he raised him slightly in bed and he had a little trouble focusing his eyes on the line he was to sign, then he took the pen and signed.

"Q. Did you hear any objections from Mr. Hendricks to signing? A. No, I did not."

He also testified he saw nothing that indicated any reluctance on the part of Mr. Hendricks to sign. We believe that the deceased's statement had reference to being moved in bed or having the pillows propped behind him and the discomforts of the ordeal, and not the physical act of signing.

It is urged that a confidential or fiduciary relation existed between the parties which gave rise to an inference of undue influence. Assuming this to be the case, it is nevertheless our view that the uncontra-dicted evidence of the defendant is sufficient to overcome such an inference.

█ The fact that the deceased, Hendricks, may have been actuated by the motives of affection and gratitude for favors shown and services rendered does not establish undue influence, nor can undue influence be predicated on mere suspicion and opportunity for its exercise. 16 Am.Jur., Deeds, Sec. 38; 26 C.J.S. Deeds § 62.

"In applying the doctrine of undue influence the courts should be careful not to interfere with the grantor's right to make a free disposal of his property, and should bear in mind that mere influence, however strong, may not be undue influence, since a person is not prohibited from exercising proper influence to obtain a benefit to himself. In other words, a distinction must be drawn between the undue influence which invalidates a deed and the influence arising from the wish to please or gratify the desires of one beloved; and a deed is not invalidated because executed pursuant to an influence arising from the grantor's affection or attachment, gratitude, confidence, sympathy, or respect toward the grantee, or because influence had been gained over the grantor by means of care, kindness, and service, or long association.

"The exercise of undue influence is not established by proof merely that a deed was executed at the suggestion or request of another, or resulted from the exertion of fair argument, advice, and persuasion, even though the deed would not otherwise have been executed, unless there is excessive importunity, as where the grantor is so worn out with importunities that his will gives way. Similarly, the proper exercise of an influence fairly and honestly acquired will not constitute an undue influence, nor will mere improp-

er influence be sufficient where not amounting to fraud. Proof of the exercise of kindnesses toward the grantor does not establish the use of undue influence; nor can undue influence be predicated on mere suspicion and opportunity for its exercise. So also, the unreasonableness of a conveyance is not of itself sufficient to show undue influence; nor is its lack of wisdom." 26 C.J.S. Deeds § 62.

"Undue influence will not be presumed from the mere fact that a deed was executed by the grantor while in his last sickness; nor is the fact that he died very shortly after the execution of the deed determinative on that issue." 26 C.J.S. Deeds § 62.

The grantor, H. W. Hendricks, is not related to the defendant, H. A. Porter. The natural bonds between the deceased and his wife had long since been severed by the divorce in 1921 and his contact with his children during the past 37 years had not been such that it may be said they were the natural objects of his bounty.

This is a trial de novo and while the decision of the trial court is entitled to appreciable weight, it is the duty of this court to carefully review and analyze the evidence, and to render a just decision based on the evidence in the case. We have done this.

It is our opinion that the plaintiffs have entirely failed to prove by a fair preponderance of the evidence that H. W. Hendricks was not competent to execute the deed in question and, further, that it is insufficient to warrant a finding of undue influence practiced upon H. W. Hendricks by the defendant, H. A. Porter. For these reasons the judgment must be, and it is, reversed.

Judgment is ordered for the defendant.

SATHRE, C. J., and BURKE, MORRIS and STRUTZ, JJ., concur.