Ralph H. RUNGE, General Guardian of the Person and Estate of Annie M. Bell, an incompetent, and Marvel Molm, Administratrix with the Will Annexed of the Estate of Elmer Bell, Deceased, Plaintiffs and Appellants,

v.

R. E. MOORE, Defendant and Respondent.

Civ. No. 8753.

Supreme Court of North Dakota.

March 28, 1972.

Freed, Dynes & Malloy, Dickinson, for plaintiffs and appellants.

Greenwood, Murtha & Moench, Dickinson, for defendant and respondent.

TEIGEN, Justice.

The action upon which this appeal is premised is being prosecuted by the legal representatives of Annie M. Bell and Elmer Bell, her husband (now deceased). The action was instituted to rescind, cancel, set aside and have declared void two mineral deeds on the alleged ground that the grantors, Annie M. Bell and her husband, Elmer Bell, were induced by duress, menace, fraud and undue influence on the part of the named grantees in said mineral deeds, and others, to execute and deliver the deeds in question. Further, if the court should find that the grantors were not induced by duress, menace, fraud or undue influence to deliver said deeds, nevertheless, at the time of the delivery of said conveyances, Annie M. Bell, who was the sole owner of the mineral interests purportedly conveyed, was mentally incompetent and unable to understand the nature and extent of the transactions, or to understand and attend to her business affairs, and that, therefore, the attempted conveyances by Annie M. Bell were a nullity and void.

This action was commenced naming R. E. Moore and Albert Gatzke as defendants. It seeks to set aside and cancel two separate mineral deeds, one to each of said defendants.

The defendant Albert Gatzke, named as grantee in one of the mineral deeds described in the complaint, defaulted. Judgment of default has been entered as a separate judgment against this defendant, cancelling and setting aside the conveyance and directing the restoration to him of the consideration paid therefor. No appeal has been taken from that judgment.

The case against the defendant R. E. Moore was contested and tried to the court without a jury. The trial court found for the defendant Moore and against the plaintiffs. The plaintiffs thereupon moved for a new trial, which was denied, and this appeal is taken from the judgment and order denying a new trial. This appeal was taken prior to July 1971 and is here for review de novo.

Following entry of final judgment the attorneys, drawing post judgment papers, changed the title of the case by dropping the name of the defendant Gatzke from the title and, after the appeal had been taken, executed and filed in this cause a stipulation seeking a further change in the title of the case. It appears from the stipulation that one of the above-named incompetents, Elmer Bell, died on March 11, 1971, and that Marvel Molm was the administratrix of his estate; that it was the mutual desire of the parties to effect a substitution of parties prior to the submission of the case to this court. Therefore the parties stipulated that an order be issued by this court forthwith and without further notice substituting Marvel Molm as administratrix with the will annexed of the estate of Elmer Bell, deceased, as a party in this action in place of Ralph H. Runge, as general guardian of the person and estate of Elmer Bell, incompetent. Pursuant to said stipulation, this court, on September 9, 1971, by a majority of the judges, entered an order accordingly and the title of the case was changed to reflect the substitution.

We are concerned here with the judgment, after trial, as the same affects the defendant R. E. Moore. This judgment confirms and validates a mineral deed dated December 30, 1969, conveying an undivided one hundred mineral acres in Section 31, Township 137 North, Range 99 West of the Fifth Principal Meridian, Stark County, North Dakota, executed and delivered for a consideration of $8,500, which was paid.

Annie M. Bell was a schoolteacher when she met and married Elmer Bell, a farmer. After their marriage, in the early 1900's, they lived on a farm located south of Belfield, North Dakota, until about 1958 when they moved into Belfield. They had no children. The farm home was located on Section 32–137–99. This section belonged to Elmer. It is not in issue here. The adjoining section, being Section 31, which is in issue here, was owned by John Bell, Elmer's brother. In 1943 John Bell and his family moved to Ellendale, North Dakota. At that time John Bell sold Section 31 to Annie M. Bell, or at least title was taken in her name.

In 1958, when the Elmer Bells quit farming and moved into Belfield, they sold their farm land. Section 31 was sold to Ernest Nielsen and Section 32 was sold to Harvey Hewson. However, the Bells reserved all of the minerals underlying the land. Thus Nielsen and Hewson became surface owners only. The land was leased for oil and Elmer and Annie M. Bell paid one-half of the cash delayed rentals received from Section 31 to John Bell. It appears that these payments were so made for a number of years. It is explained that this was done for the reason that John Bell had intended to reserve minerals when he sold the land but, through inadvertence, no reservation was contained in the deed.

In October 1966 Annie M. Bell, having suffered a severe stroke which was followed by temporary hospitalization, was admitted to St. Luke's Nursing Home, located in Dickinson, North Dakota, where she still resides. Her husband continued to live in their home in Belfield.

It appears that oil exploration activity moved in the direction of the Bell land. In the fall of 1969 the first producing oil well was brought in on the Northeast Quarter of the Northeast Quarter of Section 36 in the adjoining township, which section joins Section 31 on the west. This well became a producer and is referred to in the record as "Well No. 1". The second well, in chronological order, was drilled northwest of the first well in Section 25 and turned out to be a dry hole. The third well was drilled in Section 31 (Annie M. Bell property). It was spudded in on November 25, 1969. The drilling activity in this area created considerable interest on the part of brokers and others in the purchase of mineral interests. It appears from the evidence that Elmer Bell was approached by several persons on various occasions to sell mineral interests in Section 31.

On October 1, 1969, Annie M. and Elmer Bell executed and delivered a mineral deed conveying a $^{240}/_{640}$ (approximately 240 mineral acres) interest in Section 31 to John and Thelma Bell (husband and wife). Thelma Bell testified that the purpose of this conveyance was to carry out the intent of the parties in connection with the sale of Section 31 by John Bell to Annie M. Bell, which was to retain a percentage of the minerals in the 1943 conveyance.

On December 7, 1969, John Bell died.

On December 12, 1969, Annie M. and Elmer Bell conveyed an undivided ten mineral acres in Section 31 to the defendant Albert Gatzke for a consideration of $50 per mineral acre, or a total of $500. This mineral deed was cancelled by the judgment referred to in the early part of this opinion and the consideration which had been paid was restored.

On December 30, 1969, Annie M. and Elmer Bell conveyed an undivided one hundred mineral acres in Section 31 to the

defendant R. E. Moore for a consideration of $85 per mineral acre, or a total of $8,500. This is the mineral deed under attack in this appeal which we will refer to as the Moore deed.

The mineral deed from Annie M. and Elmer Bell to the defendant R. E. Moore was recorded in the office of the register of deeds on December 30, 1969. Thereafter, on January 12, 1970, a notice of lis pendens was filed for record in the office of the register of deeds, describing the Moore deed and advising that an action was being instituted for the cancellation, rescission and voidance thereof.

This was followed by proceedings in county court declaring both Annie M. and Elmer Bell incompetent, appointing a general guardian of the persons and estates of the Bells, and the commencement of the instant action by the service and filing of an amended complaint.

Inasmuch as this matter is before us for trial de novo, we must determine the facts anew. The facts, in the main, are without contradiction. The defendant R. E. Moore has been an independent oil broker for the past twenty years with his place of business and residence at Dickinson, North Dakota. He testified that he had been watching the exploration development in this new area; that he contacted Elmer Bell on or about the 17th or 18th day of November, 1969, with the object in mind of purchasing mineral acres in Section 31. He contacted him on various occasions during the latter part of November but was unable to purchase any mineral acres from him. These visits were at Elmer Bell's home. He testified that he first approached Mr. Bell on the sale of one hundred mineral acres at $30 per acre. This occurred before the No. 3 Well (the first well dug on Section 31) was spudded in. Mr. Moore testified that he was told by Elmer that perhaps Elmer's brother, John, would be interested in selling some mineral acres. Following this lead Mr. Moore telephoned John Bell at Ellendale from El-

mer Bell's home. However no agreement for sale was consummated but it was agreed that they would discuss the matter further at a later date. Several days had elapsed when Mr. Moore learned that there were plans to make a location on Section 31. He testified that he drove to Elmer Bell's home and told him that there were plans for drilling a well on Section 31, and he again called John Bell at Ellendale, by telephone, and informed him of this news. There was a discussion pertaining to taxes. It appears that John Bell was interested in knowing how a sale of minerals would affect his income tax liability and suggested to Mr. Moore that he contact Mr. Carl Indergaard of Belfield for information relative thereto. Mr. Moore contacted Mr. Indergaard, who does tax work, but he told him that he was not up-to-date on the matter. Following the suggestion that he then check with the income tax people at Dickinson, Mr. Moore testified that he did so and apparently passed this information on to John Bell by telephone. He was told by John Bell that, due to the pressure of business, it was impossible for him to come back to Belfield at that time, whereupon Moore stated that he considered the prospect dropped. It was not until sometime later that Mr. Moore was apprised of an opportunity to purchase mineral acres in Section 31, which resulted in the transaction in question.

Mr. Carl Indergaard is an old-time resident of Belfield, North Dakota. At the time of this transaction he was engaged in the insurance and income tax business. He has known Annie and Elmer Bell for approximately sixty years. Mr. Indergaard was a former banker (1919–1924) in Belfield and served as the Belfield postmaster from 1924 to 1934. He is well-acquainted in the community and with the Bells. Mr. Indergaard was a witness to the mark of Annie M. Bell on the Moore mineral deed and also acknowledged the signatures thereon as notary public. It appears that, at the request of Elmer Bell, Mr. Indergaard accompanied Mr. Bell from Belfield to St. Luke's Nursing Home

in Dickinson at the times when both of the mineral deeds involved in this action were executed. He testified that following the execution of the mineral deed conveying ten mineral acres in Section 31 to the defendant Gatzke, he had a conversation with Elmer Bell on the return trip to Belfield. In this conversation Elmer Bell told Mr. Indergaard that he might sell some more mineral interests and suggested that perhaps Indergaard could find someone who "would give me more money." Mr. Indergaard testified that every year he notarizes a number of deeds for different persons. Many people called on him and he testified that, when he had the opportunity, he suggested to potential mineral buyers that Elmer Bell might be interested in selling additional mineral acres. One that he so advised was C. L. Smith, who is also an independent oil broker.

The record is not clear as to who generated the offer or the acceptance of sale of one hundred mineral acres at $85 per acre. However, the record clearly establishes that it was C. L. Smith who transmitted the information to the defendant R. E. Moore that one hundred mineral acres could be purchased in Section 31 for the sum of $85 per acre, or a total of $8,500. Mr. Moore authorized C. L. Smith to purchase the same for him and furnished him with a deed form and draft for the purchase price. Mr. Smith and Mr. Indergaard agreed upon an appointment whereby Smith would meet Indergaard and Elmer Bell at St. Luke's Nursing Home in Dickinson the following morning. The purpose of the appointment was to consummate the deal. Mr. Smith testified that he had not talked with Elmer Bell prior to the meeting at St. Luke's Nursing Home. All arrangements were made with Mr. Indergaard. The record does not disclose when or where Elmer Bell signed the deed but the record is replete with evidence as to the signing of the deed by Annie M. Bell at the nursing home that morning.

At this time Annie M. Bell was approximately 91 years of age. Elmer Bell was two years younger. Annie M. Bell is a wheelchair patient at St. Luke's Nursing Home where she has resided since 1966. This meeting occurred on December 30, 1969. Mr. Indergaard testified, in respect to the signing of this deed, as follows:

"Q. Mr. Indergaard, referring to exhibit 8A, is your signature affixed there?

"A. Right.

"Q. And were you present when the deed was signed?

"A. Yes, I was.

"Q. Where did that take place?

"A. In Mrs. Bell's room.

"Q. At St. Luke's Home?

"A. Yes.

"Q. And was it on this day, 30th of December of 1969?

"A. Right.

"Q. Who was present at the time when she signed the deed?

"A. Mr. Bell was there and Mr. Smith and myself.

"Q. All of those names are shown on the instrument, is that right?

"A. Right.

"Q. You and Mr. Smith signed as witnesses and Mr. Bell signed as a grantor on the deed. Is that right?

"A. Right.

"Q. Was anybody else present at that time?

"A. Not at that time, no.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Did all of you folks come to the home together, that is, you and Mr. Smith and Mr. Bell?

"A. Mr. Bell and I came down from Belfield together, Mr. Smith was here at the door.

"Q. He met you there, is that right?

"A. Yes.

"Q. Did you go to see Mrs. Bell together?

"A. Yes.

\*   \*   \*   \*   \*   \*

"Q. Now, will you just tell in your own words, Mr. Indergaard, what took place, what was said when you got to Annie Bell's room?

"A. Yes. Elmer spoke to his wife and said, 'I got an oldtimer you remember, Annie, Carl Indergaard of Belfield, you remember him?' She said, 'how can I forget him, he was my postmaster for years.'

"Q. You remember anything else said?

"A. Then he said, 'I had a chance to sell some more minerals, Annie, at a much better price than the last we sold,' he said, 'we can get eighty five ($85.00) dollars an acre.' 'I wanted more but,' he said, 'that is as high as I can get, and that's eighty five hundred ($8500.00) dollars. Does that sound all right?' She said, 'I will leave it to you.'

"THE COURT: 'I will leave it to you.' Is that what she said?

"A. Yes. She said, 'that is a lot of money, Elmer.'

"Q. Is that the extent of what was said about the transaction? Was anything else said about the deal then?

"A. Not anymore about the deal. She said she was a school teacher and she was teaching Elmer and she helped take care of his bookwork, and she said, 'now I am leaving everything to you, Elmer, you done a good job.'

"Q. Do you happen to know how long ago it was she was teaching school, or did she say at that time?

"A. No, I can't. I would say probably twenty (20) years may be.

"Q. But she has not taught for many years?

"A. Right.

"Q. How long were you in the room with Mrs. Bell on that occasion?

"A. Oh, I would say probably ten (10) minutes.

"Q. Did you leave then with the other fellows or not?

"A. Right, yes.

"Q. Did all three of you go together?

"A. Elmer and I went home and I don't know if Smith went home.

\*   \*   \*   \*   \*   \*

"Q. Well, when you went in with this deed, as you have testified, did you notice anything out of the ordinary about Annie?

"A. About him?

"Q. About Annie Bell?

"A. No, she acted like she had for quite a while.

"Q. She knew you?

"A. She knew me, yes, as soon as he told her who I was and she recognized my voice, she recognized it right off.

"Q. Do you have an opinion as to whether she was competent then to—

"MR. DYNES: We object, beyond the scope of the direct examination.

"THE COURT: You may answer.

"Q. Carl, do you have an opinion as to whether Annie was competent to enter into this deal at that time?

"A. I think she understood it very well.

"Q. In other words, she knew she was selling some minerals, didn't she?

"A. Right.

\*   \*   \*   \*   \*   \*

"Q. Mr. Indergaard, how often had you seen Annie Bell over the period of several months prior to December 30, 1969?

"A. Can I say, we had a, my wife's brother whose wife was in the St. Luke's Home and we went down there about once a week and we would always stop in to see Mrs. Bell, and we used to, usually took Mr. Bell with us.

"Q. So you saw him (her?) quite often. Is that right?

"A. Right.

"Q. And how would you describe her condition on these various times you saw her, as they compared with the time on December 30th? Was she about the same or was it different?

"A. She was always glad to see my wife and I and she even joked a little. Really didn't stay there too long, just a few minutes, you know. She asked about how my sister-in-law was, she was interested in her.

"Q. I might then ask you this. Would it be fair to say you seen her three-four times during the previous month?

"A. About once a week.

"Q. It would be fair to say three, four times. On these occasions, once a week or three, four times, was she about the same each time, as far as your observation was concerned?

"A. About the same.

"Q. And was she also about the same on September (December?) 30th?

"A. I think she was, she was getting a little older, couldn't get around like she did when she was home, before she went to the hospital.

   *    *    *    *    *    *

"Q. Did you receive any compensation for the work that you did in connection with the signing of the deed?

"A. Not that deed. I think I—Mr. Gatzke gave me ten dollars for my expenses down.

"Q. But none on this one. Is that it?

"A. No."

Carl Indergaard was present as a witness and notarizing officer on all three mineral deeds executed by Annie M. and Elmer Bell in the fall of 1969. These deeds are described above: the first one being to John and Thelma Bell, the second one to the defendant Gatzke, and the third one to the defendant Moore.

Mr. Indergaard's testimony with respect to the signing of the Moore deed on December 30, 1969, was verified and corroborated by C. L. Smith, who represented Mr. Moore in the transaction, in his testimony pertaining to the actual execution of the deed, and conforms in all respects with that of Mr. Indergaard as to what occurred, what was said, and the conclusions drawn.

The evidence also establishes that Elmer Bell made a vist to Section 31 on December 26, 1969, the day following Christmas. He was driven to the site by Mr. Ernest Nielsen, who was then the owner of the surface of Section 31. He viewed the well and drill site on Section 31. The well rigging had been removed and the well was in the testing stage. This was only four days before the transaction on December 30, 1969.

■ In viewing the evidence carefully we find nothing to support the claim that the defendant R. E. Moore, or his agents or associates, committed fraud or misrepresentation in connection with this transaction so as to entitle the plaintiffs to a decree cancelling or rescinding the conveyance.

The appellants, legal representatives of the Bells, argue that, taking into consideration the physical and mental condition of Annie M. Bell, Mr. Moore and his asso-

ciates exercised undue influence upon her. The record does not establish that Mr. Moore, or his agent Mr. Smith, exercised any influence whatsoever over Annie M. Bell. The appellants attempt to classify Carl Indergaard as an associate of Mr. Moore. However, it is clear from the record that Mr. Carl Indergaard was acting on behalf of the Bells as their friend and associate and that he did so at the request of Elmer Bell who asked him to seek mineral buyers for him at a higher price. The record is completely devoid of any evidence of undue influence. The record does not even suggest that a price of $85 per acre was offered by Mr. Moore or Mr. Smith. The only conclusion that can be drawn from the record is that the price at which these minerals were sold was determined by Elmer Bell in collaboration with Carl Indergaard, and was accepted by Annie M. Bell. Further, there is no evidence in this record to establish that $85 per acre was not a fair price as of December 30, 1969. As a matter of fact, only a few days later it was probably a high price because the well in the process of being tested in Section 31 on about December 30, 1969, was shut in as a dry hole early in January 1970.

The arguments in support of the claim of fraud or misrepresentation in connection with this transaction were also premised on speculation. It is argued that Annie M. Bell was institutionalized and, therefore, was out of touch with what was going on in the outside world; therefore, it would be reasonable to require that she be advised of factors involving oil discoveries, wells, spacing orders, etc., in order to be placed in a position for making an intelligent decision. The record, however, does not establish that she had not been informed of these matters, or that her husband, Elmer Bell, had not been informed, or that she was not knowledgeable in the area. There is no proof in this record to support the arguments.

The defendant, Mr. Moore, is an oil broker. Before purchasing these mineral

acres he wished to know whether he had a sale for them. Therefore he telephoned a Mr. Higgins, who resided in the state of Illinois, for whom he had purchased oil interests on prior occasions. Mr. Higgins authorized Mr. Moore to draw a draft on him in the amount of $8,500 for the purchase of the mineral acres in question here. This was in accordance with general brokerage practice. Mr. Higgins, in turn, sold some of the mineral acres to other parties in the eastern part of the United States. These transactions apparently were at a profit but profit does not necessarily indicate the fair value of mineral interests in the land nor does it constitute fraud against the original seller. Although an issue was made of the profit in the trial of the case, it is noted that this argument was dropped from the arguments in this court and we believe properly so.

It is noted that neither Annie M. nor Elmer Bell testified, although both had been subpoenaed and were in the trial city on the date of trial. The attorney for the legal representatives of the Bells argues that he considered the Bells to be incompetent and therefore could not run the risk of calling them as witnesses at the trial. He suggested that inasmuch as the defendant had them under subpoena the defendant could have called them as adverse witnesses. The trial court was somewhat incensed by the fact that Annie M. and Elmer Bell were not called as witnesses, and made reference thereto in his oral memorandum of decision. We agree with the trial court in this respect and feel that all of the evidence which could have been produced in order to have a complete trial was not produced, and that the burden was on the attorneys for the plaintiffs to produce them at the trial as witnesses.

Secondly, the contention is made by the legal respresentatives of the Bells that if the court should find that they were not induced by duress, menace, fraud or undue influence to deliver the mineral deeds, nevertheless, at the time of the delivery, they were mentally incompetent and unable to

understand the nature and extent of the transactions, or to understand and attend to their business affairs, and that, therefore, the conveyances were a nullity and void. They argue that this is particularly true insofar as Annie M. Bell is concerned, she being the sole owner of the mineral interests underlying Section 31.

During trial and on motion for new trial the legal representatives of the Bells supported their argument on the basis of two statutes, Sections 14-01-01 and 14-01-02, N.D.C.C. Section 14-01-01, N.D.C.C., provides:

"A person entirely without understanding has no power to make a contract of any kind, but he is liable for the reasonable value of things furnished to him necessary for his support or the support of his family."

Section 14-01-02, N.D.C.C., provides:

"A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before his incapacity has been determined judicially upon application for the appointment of a guardian is subject to rescission as provided by the laws of this state."

On this appeal no reference is made in the arguments to Section 14-01-01, N.D.C.C., and we assume the arguments made to the district court on this statute are now abandoned.

The trial court found:

"That on the 30th day of December, 1969, Elmer Bell and Annie Bell were mentally competent and able to understand the nature and extent of the action taken and that Elmer Bell and Annie M. Bell were competent to transact such business at the time and place of said conveyance."

These findings are supported in an oral memorandum opinion given by the court the day following the close of the trial.

This case is here for trial de novo under Section 28-27-32, N.D.C.C. The appeal was taken before the trial de novo section was repealed by Chapter 311 of the Session Laws of 1971. For this reason this court must review the record here presented and find the facts for itself. In a trial de novo the findings of the trial court are not clothed with the same presumptions in their favor as in other cases but, on the other hand, in such a case as this, we must take into consideration the fact that we have here but a cold and lifeless record. We are called upon to determine the soundness or unsoundness of a person's mind. In other words, we are required to judge the state of mind of a person and to determine whether it was unsound but not entirely without understanding at the time of the transaction in question. Mr. and Mrs. Bell were not present at the trial and did not testify. However, a short deposition taken from Mrs. Bell on May 21, 1970, almost five months after the transaction in issue here, was introduced in evidence. Therefore our decision must be based almost entirely upon the testimony of others who appeared and testified before the court in person, which testimony is in conflict. We do not have the advantage of seeing these witnesses, of noting their demeanor, or hearing their voices, or the other innumerable intangible indicia that are so valuable to a trial judge in determining the character, veracity and judgment of such witnesses. The trial judge had the advantage of all these things in breathing the air of the trial. He was in an immeasurably better position to find the real facts in the case. Therefore, notwithstanding that the case is here for trial de novo, we must give appreciable weight to the determination of the trial judge. Mertz v. Weibe, 180 N.W.2d 664 (N.D.1970); Koistinen v. Farmers Union Oil Company of Rolla, 179 N.W.2d 327 (N.D.1970); Rieger v. Rieger, 175 N.W.2d 563 (N.D.1970); Dvorak v. Kuhn, 175 N.W.2d 697 (N.D. 1970); Seco, Inc. v. Gauvey Rig & Trucking Company, 166 N.W.2d 397 (N.D. 1969).

We will now proceed to review the evidence to ascertain whether the mineral deed is voidable because of the unsoundness of mind, as defined in Section 14–01–02, N.D.C.C., at the time of the transaction in question, to wit, December 30, 1969.

We have already alluded to the fact that Annie M. Bell was approximately 91 years of age at the time of this transaction and that her husband, Elmer Bell, was about two years younger.

According to the testimony of Thelma Bell, a sister-in-law of Annie M. Bell who had known her for approximately fifty years, Annie M. Bell was a former schoolteacher and farmwife, who, with her husband, retired from the farm and moved into Belfield where they lived for seven or eight years before she was stricken with a crippling stroke that disabled her left side. Prior to that time she had no physical disability and was healthy for her age. According to the witness, she suffered the stroke in October 1966 and, since that time, has been quite helpless. She needs assistance to get out of bed, she has not been able to walk unaided since that time, and has not had any use of her left arm. It appears from other evidence that Annie Bell is a wheelchair invalid; that her left arm and leg are useless. It was the witness's opinion that the stroke almost destroyed Annie Bell's mental alertness but that she slowly regained mental alertness but never to the point possessed before her stroke. She was released from the hospital and then entered St. Luke's Nursing Home in Dickinson, where she still resides. Thelma Bell resides at Ellendale, North Dakota, but visits with Annie Bell in the nursing home in Dickinson on several occasions each year. Giving her opinion of the mental condition of both Annie M. Bell and Elmer Bell, she testified as follows:

"Never since her illness had I considered her competent under no condition would we have made any new agreement with either Elmer or Annie at that time.

\*     \*     \*     \*     \*     \*

"I had never from the time of her illness found her in a state of mind that I considered would be competent for any business. She seemed to have lost that area."

In describing Annie Bell during the fall of 1969 and early 1970, she gave the following answers to the following questions:

"Q   When you discussed matters with Annie Bell during that period, could she carry on a conversation?

"A   She could carry on a conversation but she had no recall of business matters as far as I know.

"Q   But as to discussing the matter with you once she recognized you, did she know who she was talking to?

"A   Oh, yes.

"Q   Could she carry on a coherent conversation with you?

"A   Yes.

"Q   She could understand what you said?

"A   Oh, yes.

"Q   And you understood what she said?

"A   Yes.

"Q   When I say as far as Annie Bell is concerned, this what you just said would be true for the period of the fall from September of '69 through January of 1970?

"A   Yes. Although as far as I can tell she had no recall of any business matters to discuss or think about.

"Q   But at the time when you were discussing matters with her, she understood what you were discussing, correct, I mean you have answered yes?

"A   Yes."

On October 1, 1969, Annie M. Bell and Elmer Bell executed and delivered to John and Thelma Bell a mineral deed conveying a 240/640 interest in and to all of the oil,

gas and other minerals in and under Section 31. During the examination and after Thelma Bell had testified on deposition that she did not believe that Annie M. Bell was competent during the fall of 1969, or, as a matter of fact, from the time she had a stroke in 1966, to conduct business, she was asked this question:

"Q I'd like for you to just briefly explain to me why you feel that the conveyance to you and John from Annie is a legitimate conveyance.

"A I can explain that very briefly because it is a legal expression of a condition that existed since we conveyed the land to them. The agreement was understood between the four of us and Elmer acted upon this agreement in sending John's half of each rental check that he received."

And, in explanation of her opinion, she was later asked:

"Q Do you have an opinion as to whether Annie was competent to understand the full nature and extent of this sale or deed of minerals from herself and Elmer to John in the fall of '69? Just yes or no.

"A Yes, I have an opinion.

"Q What is that opinion?

"MR. MOENCH: I object, no proper foundation, calling for a conclusion.

"A I would say she was not competent to decide for herself."

She also testified that she was not present on December 30, 1969, and had no personal knowledge of the transaction in question in this action or of Annie M. Bell's condition on that particular day.

Annie M. Bell did not testify in person; however, a deposition which was taken on May 21, 1970, approximately four and one-half months after the mineral deed was given, was introduced. She deposed that she was 91 years old and had lived at St. Luke's Nursing Home for about four years and that, prior thereto, she had lived with her husband in Belfield, North Dakota. She testified that she had a high school education and had taught school for ten years before she married. She did not teach after her marriage. There were many things she did not remember. For example, she did not remember whether Carl Indergaard had visited her (he signed as a witness on both the Moore and the Gatzke deeds). She testified, however, that she remembered Carl Indergaard and that she had always felt that the Indergaards were "all right". Specifically, she did not recall selling minerals at $50 per acre nor for $8,500, although she recalled that she and her husband had sometimes talked regarding the sale of minerals. She also testified that she did not know whether there were oil wells upon their old farm but that there may be oil wells located thereon, and then stated that "I heard and perhaps I forgot." She testified that her husband managed the family affairs and took care of the bills and the checking and savings accounts, and that she did not know the monthly cost of staying at the Home.

The deposition was offered in evidence by the legal representatives of the Bells and received over the objection by Moore on the ground that it was taken several months after the transaction in question and after Elmer and Annie M. Bell had been declared incompetent by the county court.

There were several other witnesses called by the plaintiffs to testify relative to the mental condition of Annie M. Bell.

Robert J. Myrand, administrator of St. Luke's Nursing Home, testified that he was not present at the time of the transaction on December 30, 1969; he had no opinion as to whether or not Mrs. Bell was able to understand and transact business matters; and he was not concerned about her competency or her ability to conduct business affairs because her husband was there with her when business was done and that this made it all right.

Mrs. Kenneth Volke, a registered nurse employed at the nursing home, testified that on various occasions she had the opportunity to converse with Mrs. Bell regarding casual and light topics, including her health. However, she never discussed business or mineral interests with Mrs. Bell. She did testify that, in her opinion, Mrs. Bell was not competent to conduct business; however, she was not present on the day of the transaction, to wit, December 30, 1969, and did not know whether Mrs. Bell had knowledge pertaining to her mineral rights or not.

Ernest Nielsen testified that he purchased the surface land in Section 31 from Elmer and Annie M. Bell in 1958 but since that time had had very little contact with them. However, he had learned that some mineral acres previously conveyed by the Bells to Little Missouri Minerals Association might be regained in a proper legal proceeding. He testified that the Bells had also conveyed mineral acres in Section 32 to Little Missouri Minerals Association and later sold the surface to his neighbor, Mr. Hewson. Therefore, he and Mr. Hewson went to an attorney and obtained an instrument which would authorize Mr. Nielsen and Mr. Hewson to take whatever legal steps were necessary to regain these mineral acres from Little Missouri Minerals Association. This instrument was taken to the Bells for their signatures at St. Luke's Nursing Home. He testified that Elmer Bell explained the matter to his wife but that he, Nielsen, didn't feel that she fully understood the transaction. However, after she had signed the instrument, he testified that it was his opinion that she knew that she had signed a legal instrument and that he had no reason to believe that she wasn't satisfied, but qualified his testimony by stating that he felt she did not fully know what she was signing. This was a very complicated transaction whereby Mr. Nielsen and Mr. Hewson were to receive two-thirds of the mineral acres recovered from Little Missouri Minerals Association but that the expenses of the litigation were to be borne by Mr.

Nielsen and Mr. Hewson. This agreement was signed in spite of the fact that Mr. Nielsen was advised that a proceeding had been commenced just a few days earlier in the county court to have both Annie M. and Elmer Bell declared incompetent.

Mr. Nielsen also testified that he had attempted to purchase eighty mineral acres at $100 per acre from Elmer Bell but that Mr. Bell had refused, stating that he had been advised not to sell mineral acres to him. This supposedly occurred on December 18, 1969.

Ralph H. Runge testified that he was guardian for both Annie M. and Elmer Bell, having been appointed by petition filed January 13, 1970. Mr. Runge was an old acquaintance. He testified that he did not think that, at the time of the transaction of December 30, 1969, Annie M. Bell was able to understand the nature and effect of a mineral transaction. However, he also testified that he had never discussed mineral transactions with her, although they had visited socially on occasion. He testified, as guardian, that the Bells had about $45,000 in the bank in cash and bonds; that Mr. Bell had taken care of his own affairs until the guardianship; and that subsequent thereto he still took care of his own affairs on a limited basis. It appears from this testimony that the reason for the initiation of the guardianship proceedings was because it was felt, on the part of Mr. Runge and others, that the Bells had sold their mineral interests too cheap. It is noted from the petition to appoint guardian, signed by Mr. Runge, that it is alleged that Elmer Bell is the owner of minerals adjacent to a producing well and that these minerals should have a value in excess of $20,000 with an annual income in excess of $2,000 per year. As to the petition to appoint guardian of Annie M. Bell, Mr. Runge has alleged that he believes that she has mineral acres of a value in excess of $50,000 with a probable income in excess of $5,000 per year. In both cases he alleged that, because of advanced age, the Bells did not realize the value of

their property and had been making sales without proper consideration, and that neither was physically or mentally adequate to comprehend and manage business affairs. It does not appear that the guardianship proceedings were resisted. The limited information contained in this record, consisting of copies of the petitions to appoint guardian and the orders appointing guardian, does not indicate any resistance to the petitions.

Chester Molm testified that he had known the Bells for a long time and visited them socially on occasion. He testified that most of their discussions centered around old times on the farm and Annie's teaching experiences. He testified that he never discussed mineral interests or business in general with Mrs. Bell. He did testify that she was enjoyable to visit with. He testified that he considered the Bells successful. They had no children. It was common for them to discuss business affairs together; however, he felt that at the time of this particular transaction the Bells did not understand the mineral transaction too well.

Mrs. Chester Molm also testified. She testified that her conversations with Annie Bell usually were about Annie's health; that they never discussed business. They discussed religion, and Annie made sense when she discussed religion. Mrs. Molm had some recollection of an early discussion pertaining to minerals and she knew, on the basis of that discussion, that both Elmer and Annie Bell knew that they owned minerals, but that she did not know whether Annie Bell was competent in this respect in December 1969. She also testified that the Bells were a very close couple; that they had a certain understanding for each other and communicated well.

Paul Larsen, who is dean of the college at Dickinson, had been asked by the attorney for the legal representatives of the Bells to, in some way, evaluate Annie M. Bell. Thus, on December 11, 16, 17 and 19, 1970, almost one year after the transaction in question, Mr. Larsen talked with Mrs. Bell for the purpose of attempting to evaluate her soundness of mind. He testified that he holds a masters degree and a doctors degree but both are in education; that he is not a psychologist and has taken only general psychology courses in the field of education. However, he had training in testing and evaluating persons to determine whether they were competent to hold jobs, care for their money and "things of this sort"; therefore he was permitted to testify. He testified it was his opinion that, as of December 1970, Annie M. Bell was not competent to transact business and would not, at that time, have been able to understand the nature and extent of the transaction in question here. He testified that if this matter was explained to her by her husband and he requested her to sign a mineral deed that she would have understood that she signed a mineral deed but would probably not appreciate or understand the whole process. He testified that he had discussed previous land sales with her and that she recalled that she had sold land and which sale was made for $30 per acre, but that she now felt she should have gotten more. The record does not disclose what this sale may have entailed. The abstract of title, introduced as an exhibit, discloses that there have been various sales of land and minerals in which Annie M. Bell has participated as seller.

George Dynes, attorney for the legal representatives of the Bells, also testified. It appears from his testimony that he did not personally know either Annie M. or Elmer Bell prior to the commencement of the guardianship proceedings and the institution of the instant action. Mr. Dynes' firm was contacted by Mr. Runge and it appears that, on the basis of the information related by Mr. Runge pertaining to Annie M. and Elmer Bell, Mr. Dynes recommended that guardianship proceedings be commenced and that an action be instituted to rescind the two mineral deeds. Pursuant to this advice, these proceedings were commenced. Mr. Dynes was present at St. Luke's Nursing Home when the

sheriff served upon Annie M. Bell a petition for appointment of guardian and, we assume, a notice for hearing the same, and that he observed the sheriff making the service and thereafter he attempted to explain to Annie M. Bell the nature of the guardianship and the reason for it. He testified that Mr. Runge and Elmer Bell were present. In respect to Annie M. Bell, he testified as follows:

"She didn't seem to understand it, she didn't make any response, although she was up and in her wheelchair, in fact was out in the hallway there where she and Elmer had been sitting talking. She did make a statement to the effect, in response to Elmer, Elmer said something about, 'you can depend on me, you taught me well years before and now I will do the thinking now,' words to that effect, and she said, 'that's fine with me,' but other than that there wasn't any response she made that seemed to respond to current direct conversation.

"That was on the 13th. Ten days later, after a ten days waiting period, a guardianship hearing was held and guardian appointed.

"I did attempt to converse with her, I did mention to Mrs. Bell on the 13th that this involved her mineral rights. I pointed out that the ownership was actually in her name and not Elmer's, but she didn't seem to acknowledge it or say anything at all, she just turned to Elmer and made a smile, in fact she didn't even say anything. And based on my observation of her at that time, I definitely reached the conclusion that she was incompetent, there, for any business matters."

Mr. Dynes testified that he had not had an impartial, disinterested mineral expert determine the value of the minerals as of the date of the transaction, and that the only evidence produced in support of the petitions to appoint guardians for the Bells was the affidavit of Mr. Myrand, who is the superintendent of St. Luke's Nursing Home, and possibly the testimony of the petitioner, Mr. Runge. He testified that he did not produce testimony of an analyst or expert regarding the competency of Annie and Elmer Bell at the guardianship proceedings in county court; that no further evidence was necessary inasmuch as the petitions were not opposed. Mr. Dynes testified that an action had not been commenced to set aside the mineral deed whereby Annie M. and Elmer Bell conveyed 240 mineral acres to John and Thelma Bell, which deed was executed on October 1, 1969.

Dr. Walter C. Hanewald testified on behalf of the defense. Dr. Hanewald has been licensed by the state of North Dakota to practice medicine since 1955 and has been associated with the Rodgers-Gumper Clinic in Dickinson since 1961. He testified that he first saw Annie Bell in the emergency room at St. Joseph's Hospital in Dickinson on October 3, 1966, where she had been brought by the family because of a stroke. He cared for her at the hospital and she recuperated fairly well, although she had lost the use of her left arm and leg. On December 15, 1966, she was transferred to St. Luke's Nursing Home. He testified that he did not see Mrs. Bell again until December 26, 1968, at which time he was called to St. Luke's Nursing Home to examine her and found that she had a lump in her abdomen. He admitted her to the hospital and had a surgeon see her in consultation with him. Surgery was scheduled for the following morning to remove the obstruction; however, in some way it took care of itself during the night and no surgery was needed. Mrs. Bell was discharged and returned to St. Luke's Nursing Home on December 28, 1968. He testified that the next time he saw Mrs. Bell was on September 8, 1969, when she was readmitted to St. Joseph's Hospital because she had been having numerous strokes for several days which did not respond to the usual medication that was available at St. Luke's Nursing Home. In the hospital she was medically treated and, having all of these problems "sufficed",

was discharged and returned to St. Luke's Nursing Home on September 18, 1969. He testified that "medically-wise" this was the last time he had seen her. He was, however, asked to contact her by the attorneys for the plaintiffs in this action. He stated that he went to St. Luke's Nursing Home where he visited with her over the noon hour. He found her sitting in the wheel-chair in the hallway; she did not know him and he did not know her because neither had seen the other for some time. He stated that this visit occurred "maybe six to ten months ago", which would be six to ten months prior to January 8, 1971. He testified that he made a cursory examination of Annie Bell by asking her several questions. He testified that he had no opinion in answer to a complicated, hypothetical question based on the facts introduced in evidence surrounding the signing of the mineral deed. In answer to the question, "do you have an opinion as to her competency at that time?", he answered:

"A. I can only answer this way. Like I pointed out to begin with; she knew her age, she knew where she was at, she knew what she had for lunch, and she knew her birthdate. Now whether or not this proves her competency or not, I do not know. This is the extent of the questions I asked this lady; and if I can answer what she told me, I would say, yes, but this is limited to these simple questions."

The testimony as to the mental competency of Annie Bell is in conflict. Some of the witnesses whose testimony we have summarized have stated opinions that she was not mentally competent to transact business. However, none of these witnesses have had any business transactions with Annie Bell nor were they present at the time of the transaction in question here, and none of them have testified that, in their opinion, she was of "unsound mind, but not entirely without understanding", which is the conclusion that the court would be required to make to set the deed aside. On the other hand, all of the wit-

nesses present at the time of the transaction on December 30, 1969, testified that, in their opinion, Annie M. Bell was competent and did understand the transaction at the time the mineral deed was executed and delivered.

It is clear from the record that the Bells placed considerable confidence in Carl Indergaard. Carl Indergaard received no benefits from this transaction. He was a friend of many years standing of Annie M. and Elmer Bell. He was a businessman, engaged in the insurance and income tax business, and previously had been engaged in the banking business and had been postmaster in Belfield. He was a man of considerable experience who not only knew the Bells well but considered himself their friend and they considered him as their friend. There is no evidence in the record that the consideration of $8,500 paid was inadequate or improper. As a matter of fact, the well which was in the process of being drilled in Section 31 at the time this transaction occurred turned out to be a dry hole and was eventually shut in. Subsequent thereto, another well was drilled approximately one mile to the west of Section 31, which also was a dry hole. It was not until after these two wells had been drilled that another well was drilled in Section 31 which turned out to be a producer and which, of course, enhanced the mineral value of Section 31's mineral acres. However, this did not occur until long after this transaction was completed. It is perhaps the reason why this case is being so tenaciously fought at this time.

While it is readily admitted that Annie M. Bell was of advanced age and had been seriously physically incapacitated since 1966 when she suffered a stroke and was, therefore, in impaired health, and for some years prior to December 30, 1969, had not engaged in business affairs, these things are not conclusive as to her incompetency at the time of the execution of the deed. That must be determined as of the time of the execution of the deed in question. Johnson v. Johnson, 85 N.W.2d 211

(N.D.1957). In Lee v. Lee, 70 N.D. 79, 84, 292 N.W. 124, 126 (1940), is contained a thorough discussion of the law on this question as established in this state. It reads as follows:

"The test of capacity is laid down by this court several times. In Nelson et al. v. Thompson et al., 16 N.D. 295, 301, 112 N.W. 1058, 1060, this early rule deduced from Jackson [ex dem. Cadwell] v. King, 4 Cow.N.Y. 207, 15 Am.Dec. 354, 355, was adopted: Upon the question of incapacity to render a deed invalid, the court must be satisfied that the grantor was not in a situation to transact that particular business rationally . . . not, on the one hand, that he should be capable of doing all kinds of business with judgment and discretion, nor, on the other hand that he should be wholly deprived of reason, so as to be incapable of doing the most familiar and trifling work. That, if the mind and memory were in such a situation at the time of executing the deed as to render him wholly incompetent to judge of his rights and interests in relation to that transaction, the deed would be void.

"In Meyer et al. v. Russell, 55 N.D. 546, 214 N.W. 857, we say: 'Impairment of faculties by disease or old age will not invalidate a deed, provided the grantor fully comprehended its meaning and effect, and was able to exercise his will in executing it.'

"Again: 'Before the court will set aside a conveyance on the ground of mental incompetency of the grantor, it is necessary to show that the grantor, at the time of the execution of the instrument, was so weak mentally as not to be able to comprehend and understand the nature and effect of the transaction involved.' Nordby v. Sagen, 64 N.D. 376, 252 N.W. 383.

"Old age alone does not affect competence, even though the mind may be weak and impaired compared with what it has been, and even though the capacity to transact general business may be lacking. This is the rule set forth in 16 Am.Jur. 486, [Deeds, § 85,] and it is supported by the citation given therein —Delaplain et al. v. Grubb et al., 44 W. Va. 612, 30 S.E. 201, 67 Am.St.Rep. 788. On this point see Doyle et al. v. Doyle, 52 N.D. 380, 389, 202 N.W. 860, 863."

■ From a careful consideration of the entire record as to the mental competency of Annie M. Bell it appears that, while it may be conceded that she was not capable of doing all kinds of business due to her declining years, lack of physical vigor, and the stroke, we are satisfied that she was of such a mind and memory at the time of the execution of the deed that, with the assistance of and reliance upon her husband, Elmer Bell, she understood and comprehended the meaning and effect thereof and was able to and did exercise her will in executing the mineral deed in question.

■ There remains for us the issue raised at the trial pertaining to the manner in which the deed was executed by Annie M. Bell. It appears that there is no dispute but that Annie M. Bell was not able to write her name and that she executed the mineral deed by placing an X on the signature line. It also appears without dispute that the writing "Annie M. Bell", which also appears on the signature line, was not written by a witness who was present at the time when Annie M. Bell placed her X on the line, but was written thereon at a subsequent time by one who was not present at the signing. The statute, Section 1–01–49(4), N.D.C.C., provides that a mark is a proper signature when a person cannot write if his name is written near it and is "written by a person who writes his own name as a witness." The statute provides as follows:

" 'Signature' or 'subscription' shall include 'mark' when the person cannot write, his name being written near it and written by a person who writes his own name as a witnes;"

Section 1–01–49(4), N.D.C.C.

This statute was construed in McKee v. Buck, 72 N.D. 86, 4 N.W.2d 652 (1942) and followed in In re Burris' Estate, 72 N.W.2d 884 (N.D.1955). In *McKee,* this court said:

"It seems to us that when that portion of section 7309 [now Section 1–01–49, N.D.C.C.] with which we are here concerned was enacted, its purpose was to safeguard signatures by mark. It made a signature by mark thus witnessed prima facie of the same worth as a signature by writing. But it did not exclude other proof of a signature by mark alone. So, where a will or other writing is offered and the signature thereto is by mark, witnessed as provided in the statute, no further proof is required that the mark is the maker's signature unless that fact is challenged. And where he who writes the name of the maker to identify his mark fails to write his own name as a witness, the effect of his failure is not to destroy the signature thus made by mark but to place in the first instance the burden of proving that the mark was, in fact, made as the maker's signature, upon the proponent of the writing so subscribed."

In this case it is conceded, or at least certainly not disputed, that the mark was made by Annie M. Bell and, further, witnesses testified that they saw her place her mark on the deed.

For the reasons aforesaid, the judgment and order denying motion for new trial are affirmed.

STRUTZ, C. J., and ERICKSTAD, PAULSON and KNUDSON, JJ., concur.