Robert J. SLORBY, as Conservator of the Estate of Melvin Steffens, a Protected Person, Plaintiff and Appellee,

v.

Peter A. JOHNSON and Karen J. Johnson, Defendants and Appellants.

Civ. No. 940139.

Supreme Court of North Dakota.

March 16, 1995.

Michael G. Sturdevant (argued), Kenner Sturdevant, P.C., Minot, for plaintiff and appellee.

Carol K. Larson (argued), Pringle & Herigstad, PC, Minot, for defendants and appellants.

NEUMANN, Justice.

Peter A. and Karen J. Johnson appeal from a judgment rescinding a contract for deed, which conveyed 640 acres of farmland from Melvin Steffens to the Johnsons, on the ground of Steffens' mental incapacity at the time the contract for deed was executed. We affirm.

We view the evidence in the light most favorable to the trial court's findings. *See Chaussee v. Thiel,* 520 N.W.2d 789, 791 (N.D. 1994). Steffens was born on July 25, 1898. His wife died in 1962. The couple had no children, and Steffens' only living relatives are a sister, two sisters-in-law, and five nephews, with whom Steffens has maintained contact throughout the years. Steffens was a farmer who owned four quarter sections of land south of Berthold in Ward County.

Steffens had a long friendship with the Willard Sr. and Myrtle Johnson family, which included their sons, Peter, Willard Jr., and David Johnson. When Steffens retired from farming at age 77, he began leasing the four quarter sections to Willard Sr., and to David and Willard Jr.

Although Steffens did not remarry, he maintained a long and close relationship with Myrtle Olson. Beginning in the early to mid 1980s, Steffens lived with Olson in a house in Minot. During winters when Olson resided with her daughter in North Carolina, Steffens would live in Willard Johnson Sr.'s home in rural Berthold. Ray Johnson, Willard Sr.'s brother and another close friend of Steffens', also resided there during the winter months.

Peter Johnson has known Steffens since Peter was six or seven years old. During the mid to late 1960s, Peter helped Steffens farm the land for four years. Peter then left the farm to pursue other interests. Peter and his wife, Karen, lived in Burlington until 1983, and then moved to Crosby, where they lived until 1987. During this period, Peter's contacts with Steffens were limited to occasional visits at the Willard Johnson Sr. home and one or two visits with Steffens while he resided in Minot with Olson.

In 1987, Peter, Karen, and their children moved into an old house located on Steffens' property. Steffens and Willard Johnson Jr., the tenant at that time, agreed to allow Peter and the family to live there. While Peter did not pay rent to Steffens for living in the house, he and Karen made repairs and did other work to make the home habitable.

As Steffens grew older, he was frequently confused with regard to his business affairs. Steffens had a short attention span, had difficulty recognizing people who should have been known to him, suffered from memory lapses, was hard of hearing, and had impaired vision. He also had difficulty physically taking care of himself. During this time, Myrtle Olson and the residents of the Willard Johnson Sr. household were very protective of Steffens. Steffens relied on others to assist him in his business transactions. He would not attempt to read any documents presented for his signature, but would sign them when asked to do so by members of the Johnson family. Steffens trusted the Johnsons and relied on the representations they made to him regarding the content or effect of documents. Except for brief intervals, the members of the Willard Johnson Sr. household did not leave Steffens unattended.

In May 1990, Steffens was distraught. Ray Johnson died on May 5, 1990, and his companion, Myrtle Olson, who was visiting her daughter, was in the hospital in serious condition. Ms. Olson died on May 9, 1990.

On May 7, 1990, between the deaths of Ray Johnson and Myrtle Olson, Peter and Karen Johnson obtained Steffens' signature on a contract for deed conveying his land to Peter and Karen for $64,000. At that time the land had a value of $240,000. The contract for deed was prepared by Peter. It provided for no down payment, granted Peter and Karen three-fourths of the mineral interests, and provided for interest three percent less than the rate generally available at that time.

According to Peter, Steffens believed the land was worth $64,000, which is what he paid for it in 1964. None of the members of the Willard Sr. household were present when Peter negotiated the contract for deed with Steffens. When Steffens signed the contract

for deed, he was alone with Peter, while Karen and the children were in another room. Steffens' signature was neither witnessed by, nor acknowledged to, the notary public who later notarized the contract for deed at Peter's request.

Peter and Karen did not give a copy of the contract for deed to Steffens and did not disclose its terms to the rest of the family. The other members of the Johnson family were not aware of Peter's efforts to purchase the property. Peter informed them some time after the transaction and demanded cash rent from Willard Jr. for farming the property. Steffens, although aware he had sold his property, believed he had sold it to Willard Jr., who had been farming the land. Peter and Karen built a new home on the property and began occupying it in January 1991.

In May 1991, Willard Jr. was appointed conservator for Steffens and brought this action against Peter and Karen to rescind the contract for deed. While serving as Steffens' attorney-in-fact and conservator, Willard Jr. diverted between $80,000 and $90,000 from Steffens' bank accounts. Willard Jr. disposed of all conservatorship records and the whereabouts of the money is unknown. Willard Jr. was removed as conservator in April 1993 and Robert J. Slorby was then appointed as successor conservator for Steffens and was substituted as the plaintiff in this rescission action.[1]

After a bench trial, the trial court rescinded the contract for deed, finding:

"[O]n May 7, 1990, Melvin Steffens was a person of unsound mind and suffered a mental deficiency caused by advanced age or other cause or causes. This condition was such that Mr. Steffens lacked sufficient understanding and capacity to make responsible decisions regarding his property. Melvin Steffens was not able to enter into a Contract for Deed concerning the property since his mind and memory were of a condition which rendered him incompetent to judge his rights and interests in relation to the transaction."

Peter and Karen have appealed.

Rescission of a contract on the ground of mental incapacity is authorized by N.D.C.C. § 14-01-02. *See Thronson v. Blough,* 38 N.D. 574, 166 N.W. 132, 133 (1917) (construing predecessor statutes). The statute provides:

"A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before his incapacity has been determined judicially upon application for the appointment of a guardian is subject to rescission as provided by the laws of this state."

■ The standard for determining incapacity under the statute has been developed through a long line of authority in this jurisdiction. This court has noted that old age alone does not render a person incompetent, even though the mind may be weak and impaired compared with what it had been, and even though the capacity to transact general business may be lacking. *Lee v. Lee,* 70 N.D. 79, 292 N.W. 124, 126 (1940). Impairment of faculties by disease or old age will not invalidate a deed, if the grantor fully comprehended its meaning and effect and was able to exercise his or her will in executing it. *See Meyer v. Russell,* 55 N.D. 546, 214 N.W. 857, 869 (1927). This principle simply recognizes that the ownership of property is absolute, and a person may use it and dispose of it according to his or her pleasure. As this court explained in *Johnson v. Johnson,* 85 N.W.2d 211, 224–225 (N.D. 1957):

"This absolute ownership implies the right of arbitrary disposition of property of a capable and uninfluenced person. It is a corollary of absolute ownership. It is often true in connection with deeds or wills that the disposition of property indicates disregard of some, preference for others, partialities and caprice of the party disposing of the property. But if the party owns the property and has the mental capacity to know what he is doing and is uninflu-

---

1. During oral argument, we were informed by counsel for Peter and Karen that criminal charges were pending against Willard Jr.

enced the law does not concern itself with these matters."

■ Thus, before a court may set aside a conveyance on the ground of mental incompetency of the grantor, the party attacking the validity of the deed must show that the grantor, at the time of the execution of the instrument, was so weak mentally as not to be able to comprehend and understand the nature and effect of the transaction involved. *See Runge v. Moore*, 196 N.W.2d 87, 103 (N.D.1972); *Hendricks v. Porter*, 110 N.W.2d 421, 428 (N.D.1961); *Nordby v. Sagen*, 64 N.D. 376, 252 N.W. 383, Syllabus (1934).

■ A trial court's findings concerning capacity and competency are questions of fact which will not be overturned on appeal unless they are clearly erroneous under N.D.R.Civ.P. 52(a). *See Matter of Bo*, 365 N.W.2d 847, 850 (N.D.1985). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if the reviewing court, on the entire evidence, has a definite and firm conviction that the trial court has made a mistake. *Ludwig v. Burchill*, 514 N.W.2d 674, 675 (N.D.1994). We reject Peter and Karen's assertion that the trial court's finding of incapacity is clearly erroneous.

■ The trial court was presented with a video tape deposition of Steffens taken 16 months after the contract for deed was executed. Peter had removed Steffens from the Willard Sr. household the day before the deposition and taken him to his home for approximately eight hours. Steffens did not recognize Peter at the deposition the next morning. Although Steffens realized he had sold the land, his deposition testimony reveals his overall confusion about the transaction.

"Q  Okay. Mr. Steffens, what I'd like to talk to you about this morning is your land, your farmland.

"A  Yeah, I have no farmland no more.

"Q  You don't have farmland anymore. What happened to it?

"A  I sold it.

"Q  Okay. Who did you sell it to?

"A  Who did I sell it to? I don't know his name.

"Q  Do you remember selling the land?

"A  Well, kind of. I don't know. I know I don't have land anymore.

"Q  Okay. Do you remember signing any papers?

"A  Well, didn't I sign something when I sold the land? I must have signed it.

*  *  *  *  *  *

"Q  (Mr. Sturdevant continuing) Mr. Steffens, do you remember this piece of paper?

"A  I don't—don't know what paper. I didn't read nothing on them or nothing. I don't know anything about them. Oh, this is an agreement to sell the land?

*  *  *  *  *  *

"Q  Do you remember signing this?

"A  Yeah, it looks—yeah, I think—kind of, yeah.

"Q  Okay.

"A  I remember I put a name down on something.

*  *  *  *  *  *

"Q  . . . Who was there when you signed it?

"A  I suppose the folks must have—did a cab take me down once, maybe, when I signed it? Yeah, I'm not sure who brought me down, but maybe the cab did bring me. Did you guys take me down to sign this?

"MR. WILLARD JOHNSON: No.

"THE WITNESS: Well, I think I took—it seemed like to me like a dream, I took a cab down.

"Q  (Mr. Sturdevant continuing) Was Peter there when you signed this?

"MR. PETER JOHNSON: Mm-hum.

"THE WITNESS: Was you?

"MR. PETER JOHNSON: Yep.

"THE WITNESS: Well, I don't know.

"Q  (Mr. Sturdevant continuing) Do you remember if Peter was there?

"A  No. I don't remember that. I don't know what I signed. What's that signed for, selling the land?

"Q That's what this is. This is the paper selling the land.

"A Yeah. Well, that should be all right. The land is gone. I don't—

"Q Who—do you know who is farming the land?

"A Are you farming it?

"MR. WILLARD JOHNSON: Not this year.

"THE WITNESS: Or don't you own the land?

"MR. WILLARD JOHNSON: (Shaking head.)

"THE WITNESS: Oh, you don't?

"MR. PETER JOHNSON: No, I do.

"THE WITNESS: You own it?

"MR. PETER JOHNSON: Yep.

"THE WITNESS: Are you farming it then?

"MR. PETER JOHNSON: Yeah, we rented it out this year.

"A (Mr. Sturdevant continuing) Okay. Now, that was Peter that said that now.

"MR. PETER JOHNSON: Yeah.

"THE WITNESS: Oh.

\* \* \* \* \* \*

"Q Do you know what a contract for deed is?

"A Huh?

"Q Do you know what a contract for deed is?

"A When?

"Q No, do you know what a contract for deed is?

"A No, I don't know.

"Q Okay.

"A I never paid no attention to any of that. I just signed what they wanted me to and the land went."

Dr. Kenneth Amstutz was Steffens' personal physician who treated him from 1982 through November 1992, seeing him more than 40 times. Although Amstutz was primarily concerned with Steffens' physical condition, Amstutz testified that Steffens was "obviously quite senile" and that he observed the senility "from when I first saw him." Amstutz noted that Steffens talked to himself during examinations and that he could not obtain a history from Steffens, but had to rely on others for that information. Board certified in internal medicine, Amstutz had considerable experience treating the elderly. Amstutz related that Steffens was unable to understand the nature of eye surgery that had been performed on him, and, in his opinion, would not have been in a position to understand or comprehend the contract for deed. Amstutz doubted Steffens' ability to attend to his financial affairs and had advised the Social Security Administration that Steffens was not capable of handling his social security benefits. In Amstutz's opinion, Steffens' "mental facilities" were not "intact" when the contract for deed was executed.

Amstutz's opinion regarding Steffens' lack of competency to enter into the May 7, 1990 contract for deed was shared by others who had known or observed Steffens for significant lengths of time. Because Steffens always signed any papers given to him, David Johnson did not believe Steffens was competent to enter into any transaction involving his land. The former girlfriend of Willard Jr., noting Steffens' tendency to "babble[ ] about things that he had done when he was 20 or 30," stated that Steffens was not mentally capable to handle his business affairs. Willard Jr., who had apparently spent more time with Steffens than the other Johnsons, agreed that Steffens was not mentally competent to sell the land in May 1990. Family friend Bradley Boschee stated that Steffens was "incapable of handling his own business" before May 1990.

There was also evidence of suspicious circumstances surrounding the transaction. Boschee testified that he overheard Peter discussing the contract alone with Steffens when Peter thought Boschee was not in the house.

"Q ... What did you overhear?

"A I heard Peter asking Melvin if it was okay if he built a hog barn out on his property. And Melvin said, no problem, whatever you want, *Willard.*

"Q Was there any more to that conversation?

"A  Yes.  Peter come back and said that, would you—I will bring a contract over for you to sign in a couple of days.

"Well, ... I went and sat down in the chair.  And when Peter got up and turned around and saw me sitting there he had a dumbfounded look on his face.

"Q  Now, when Peter said to Melvin, I'll bring by a contract in a couple of days, what was Melvin's response to that?

"A  He says, bring back whatever you need signed.  He had at that time asked him if he would sign a contract and he said, bring back—bring whatever you need signed.  I'll sign it."  (Emphasis added).

This evidence suggests that Steffens believed he was dealing with Willard Jr. rather than with Peter and .that Peter deceived Steffens about the nature of the transaction. Peter then obtained Steffens' signature on the contract for deed when the other members of the Johnson family were not at home and without informing them of the transaction.  These circumstances permit an inference that Peter was fully aware of Steffens' lack of capacity to execute the contract for deed.

Peter and Karen argue that Steffens was fully competent to sell the land in May 1990. According to Peter, he approached Steffens about purchasing the farmstead and 50 acres surrounding it so he could build a new home and raise livestock.  Steffens told him he did not want to split up the farm and suggested Peter buy all of it for $64,000 because "that's what he had paid for it."  Peter told Steffens that the land was worth more than $64,000. However, according to Peter, Steffens told him that "he didn't need a lot of money coming in and if he got big money for it he would have to pay taxes."  Also, according to Peter, Peter then offered to pay Steffens the purchase price over a 10 year period, they agreed to the other terms, Peter typed the contract for deed at his home, and then returned on May 7, 1990 to obtain Steffens' signature.

Peter and Karen relied on Dr. Stephan Podrygula, a clinical psychologist, as their expert witness.  Podrygula testified that he believed Steffens comprehended the meaning and effect of selling his land and was able to exercise his will in signing the contract for deed.  Podrygula, however, had not met, evaluated, or interviewed Steffens personally, but arrived at his conclusions solely by viewing Steffens' video tape deposition.  Podrygula noted a "traumatic difference" between Steffens' confused answers to questions at the beginning of the deposition and the more appropriate answers to abstract questions given toward the end of the deposition.  Podrygula was not aware, however, of Peter's physical movements during the deposition to attempt to get Steffens' attention, or that Peter had spent eight hours with Steffens the night before the deposition, and stated he was "a little concerned.  I would have liked to have been able to explore what was happening."  Podrygula testified that he was also concerned about "the circumstances under which [Steffens] signed the paper." Podrygula admitted that Steffens "certainly" exhibited signs of senile dementia.

Peter and Karen also rely on the testimony of two landmen who negotiated oil and gas leases with Steffens on prior occasions. They testified that Steffens was competent to lease his minerals.  However, in those instances, Steffens was not left alone with either of the landmen during the lease negotiations and Steffens did not sign the leases until Willard Sr. and Willard Jr. explained them to him.

The trial court was not required to accept the opinions of defense witnesses about Steffens' competency.  On this record, we conclude that the trial court's finding that Steffens lacked the mental capacity to enter into the May 7, 1990 contract for deed is not clearly erroneous.

Peter and Karen also attack the trial court's alternate theory for rescinding the contract for deed.  The trial court concluded that it would be "unconscionable" to enforce the contract for deed, apparently because of the low purchase price and other favorable terms given to Peter and Karen.  They assert that the unconscionability theory was merely an attempt by Slorby to have what he views as "fraudulent actions" on their part considered by the trial court without having

to meet the burden required to prove fraud or undue influence, neither of which were pled in the complaint.

■ Whether the contract for deed can be viewed as "unconscionable" in either a purely commercial or general equitable sense may be debatable in this case. But we need not decide the question here. The low price and other favorable terms, while they may not alone be indicative of a person's mental capacity, could certainly be considered by the trial court as one of many factors in deciding whether Steffens was competent to execute the contract for deed. *See Buchanan v. Prall*, 39 N.D. 423, 167 N.W. 488, 489 (1918) (that person conveyed land at much less than its value, along with testimony of physicians and others, showed sufficient weakness and unsoundness of mind to support rescission). Moreover, the surreptitious circumstances surrounding the execution of the contract for deed could be viewed by the trial court, at the very least, as adversely affecting the credibility of Peter's testimony about the transaction.

We have considered the case law relied on by Peter and Karen. The cases are distinguishable, not only because of their peculiar facts, but because the appellate court in many of them was performing trial de novo, a practice that differs from our appellate review under N.D.R.Civ.P.Rule 52(a). We have also considered the other arguments raised and they do not affect our decision.

The judgment is affirmed.

VANDE WALLE, C.J., LEVINE and SANDSTROM, JJ., and RALPH J. ERICKSTAD, Surrogate Judge, concur.

RALPH J. ERICKSTAD, Surrogate Judge, sitting in place of MESCHKE, J., disqualified.